UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| THOMAS NORTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:17-cv-351-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| JOY BEASLEY, in her official capacity as | ) | **AND ORDER** |
| Keeper of the National Register of Historic | ) | |
| Places, et al., | ) | |
| | ) | |
| Defendants. | | |

*** *** *** ***

This matter is before the Court on Plaintiffs' Motion for Summary Judgment, [R. 47], to which Defendants responded and filed a Cross-Motion for Summary Judgment, [R. 51].[1] Plaintiffs filed a response to Defendants' motion, [R. 54], and a reply to Defendants' response, [R. 55].[2] Defendants have filed a reply to Plaintiffs' response, [R. 56]. For the reasons set forth herein, the Court will deny Plaintiffs' Motion for Summary Judgment, [R. 47], and grant Defendants' Cross-Motion for Summary Judgment, [R. 51].

## I. BACKGROUND

### A. The National Historic Preservation Act

#### 1. Powers and Responsibilities of the Secretary of the Interior and the State Historic Preservation Officer

---

[1] Defendants initially filed a combined response and motion, and the document was docketed twice, once as a response, [R. 49], and once as the Cross-Motion for Summary Judgment, [R. 50]. Several days later, Defendants filed a corrected combined response and motion, [R. 51].

[2] Plaintiffs filed a combined response and reply, and the document was docketed twice, once as a response, [R. 54], and once as a reply, [R. 55]. For clarity, the Court will cite to the response, [R. 54], throughout.

The National Historic Preservation Act ("NHPA") authorizes the Secretary of the Interior ("Secretary") to "expand and maintain a National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." 54 U.S.C. § 302101. To achieve this, the Secretary is tasked with "establish[ing] criteria for properties to be included on the National Register and criteria for National Historic Landmarks." *Id.* § 302103(1). The Secretary must also promulgate regulations for, among other things, "nominating properties for inclusion on, and removal from, the National Register and the recommendation of properties by certified local governments," designating or delisting properties, considering appeals, and notifying owners, local governments, and the general public that a property is being considered for inclusion on the National Register. *Id.* § 302103(2).

The Secretary is also required to promulgate regulations allowing for owner participation in the nomination process. Specifically, the Secretary must promulgate regulations

> requiring that before any property may be included on the National Register or designated as a National Historic Landmark, the owner of the property, or a majority of the owners of the individual properties within a district in the case of a historic district, shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property for inclusion or designation. The regulations shall include provisions to carry out this section in the case of multiple ownership of a single property.

*Id.* § 302105(a).

The NHPA "also contemplates a role for states in carrying out its objectives." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 517 (D.D.C. 2016), *rev'd on other grounds by Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014). For example, the Act directs the Secretary to promulgate regulations for State Historic Preservation Programs. 54 U.S.C. § 302301. A State Historic Preservation Program must provide for the designation and appointment of a State Historic

- 2 -

Preservation Officer ("SHPO") to administer the program. *Id.* § 302301(1). The Act directs the SHPO to undertake various responsibilities, including "identify[ing] and nominat[ing] eligible properties to the National Register and otherwise administer[ing] applications for listing historic properties on the National Register." *Id.* § 302303(b)(2).

### 2. Regulations Governing the Nomination and Listing of Properties

"The regulations governing the procedures for [including] properties on the National Register are set forth at 36 C.F.R. pt. 60." *Salazar*, 177 F. Supp. 3d at 517 (quoting *Moody Hill Farms Ltd. P'ship v. U.S. Dep't of Interior*, 205 F.3d 554, 556 (2d Cir. 1999)) (internal quotation marks omitted). These regulations "divide the inclusion process into two stages: nomination and listing." *Id.* The nomination process "is the process by which the [SHPO] selects property for potential inclusion in the National Register." *Id.* (citation omitted); *see also* 54 U.S.C. § 302104(a). The listing process "refers to the addition of '[n]ominations . . . submitted by the [SHPO] and approved by the [Keeper of the National Register of Historic Places]' for inclusion in the National Register." *Salazar*, 177 F. Supp. 3d at 517 (quoting 36 C.F.R. § 60.1(b)(3)).

The nomination process typically begins with the SHPO, who bears the responsibility of "identifying and nominating eligible properties to the National Register." 36 C.F.R. § 60.6(a). Toward this end, the SHPO supervises the preparation of the nomination forms and "establishes statewide priorities for preparation and submittal of nominations for all properties meeting National Register criteria for evaluation within the State." *Id.* The SHPO must also "consult with local authorities in the nomination process." *Id.* § 60.6(b).

Under the regulations, the SHPO must also provide notice to affected property owners. Specifically, the SHPO must provide "notice of the intent to nominate a property and solicit[] written comments especially on the significance of the property and whether or not it meets the

National Register criteria for evaluation." *Id.* The SHPO must also provide the property owners "an opportunity to concur in or object to listing" the property. *Id.*

The regulations provide additional details about the notice and objection procedures. First, the SHPO must identify the property owners "from either official land recordation records or tax records, whichever is more appropriate, within 90 days prior to the notification of intent to nominate." *Id.* § 60.6(c). The SHPO must then notify the property owners in writing of "the State's intent to bring the nomination before the State Review Board," unless a nomination involves more than fifty property owners, in which case the SHPO need only provide "general notice" to property owners in the form of a published notice. *Id.* § 60.6(c)–(d).  The owners must be notified that they have "at least 30 but not more than 75 days to submit written comments and concur in or object in writing to the nomination of such property." *Id.*

To object to a nomination, a property owner must submit to the SHPO "a notarized statement certifying that the party is the sole or partial owner of the private property, as appropriate, and objects to the listing." *Id.* § 60.6(g). When multiple owners are involved, "the property will not be listed if a majority of the owners object to listing." *Id.*  The regulations further explain that "[e]ach owner of private property in a district has one vote regardless of how many properties or what part of one property that party owns and regardless of whether the property contributes to the significance of the district." *Id.* Ultimately, the responsibility of determining whether a majority of owners have objected falls on the SHPO. *Id.*

Once the nomination form is completed, the form and other documentation (including comments and objections) are submitted to the State Review Board. *Id.* § 60.6(j). The State Review Board then reviews nomination forms and any comments and "determine[s] whether or not the property meets the National Register criteria for evaluation." *Id.* The State Review Board

then "make[s] a recommendation to the [SHPO] to approve or disapprove the nomination." *Id.* If

the SHPO "finds the nominations to be adequately documented and technically, professionally,

and procedurally correct and sufficient and in conformance with National Register criteria for

evaluation, the nominations are submitted to the Keeper of the National Register of Historic

Places." *Id.* § 60.6(k). In signing the nomination form, the SHPO certifies that "[a]ll procedural

requirements have been met," and the form is "adequately documented" and "technically and

professionally correct and sufficient." *Id.* § 60.06(o). The SHPO also certifies that it is his or her

opinion that "the property meets the National Register criteria for evaluation." *Id.* However, if

the SHPO does not believe that the property meets the criteria for evaluation, he or she must

explain his or her opinion on eligibility. *Id.* § 60.06(p). Typically, so long as the Keeper approves

the nomination, no appeal is filed, and less than a majority of owners object, the nominated

property is listed in the National Register of Historic Places within forty-five days of its receipt

by the Keeper. *Id.* at 60.6(r).

However, if the SHPO determines that a majority of the property owners object, the

SHPO "shall submit the nomination to the Keeper only for a determination of eligibility." *Id.* at

§ 60.06(n). Under those circumstances, "the Keeper shall review the nomination and make a

determination of eligibility within 45 days of receipt, unless an appeal is filed." *Id.* § 60.6(s). A

property is considered eligible for listing if it "meets the National Register criteria for evaluation

although the property is not formally listed in the National Register." *Id.* § 60.3(c). According to

the National Register criteria for evaluation, "[t]he quality of significance in American history,

architecture, archeology, engineering, and culture is present in" properties that "possess integrity

of location, design, setting, materials, workmanship, feeling, and association and" are (1)

associated with historical events; (2) associated with significant persons; (3) "embody the

distinctive characteristics of a type, period, or method of construction" or otherwise "possess

high artistic values"; or (4) "have yielded, or may be likely to yield, information important in

prehistory or history." *Id.* § 60.4. If a property is deemed eligible but is not listed on the National

Register, that property may not qualify for certain benefits, such as grants, loans, or tax

incentives. *Id.* § 60.3(c).

If an eligible property has been listed in the National Register, a party may petition for its

removal. *Id.* § 60.15(c). To do so, the petitioning party files a written petition with the SHPO

"setting forth the reasons the property should be removed on the grounds established" in the

regulations. *Id.*  The regulations, in turn, provide that a property may be removed from the

National Register because "[a]dditional information shows that the property does not meet the

National Register criteria for evaluation"; there has been some "error in professional judgment as

to whether the property meets the criteria for evaluation; or there has been "[p]rejudical

procedural error in the nomination or listing process." *Id.* § 60.15(a)(2)–(3). The SHPO

ultimately forwards the removal petition to the Keeper, who typically must respond within forty-

five days. *Id.* § 60.15(c), (j).

### B.  Preparation of the Nomination of Upper Reaches of Boone Creek

The Clark County-Winchester Heritage Committee ("Heritage Committee") is a joint

commission that manages historic properties in Clark County, Kentucky. NR p. 2112.[3] In June

2008, an employee with the Heritage Committee submitted to Kentucky's SHPO a draft

nomination packet for the Upper Reaches of Boone Creek ("Upper Reaches" or "the District").

*Id.* at 2056, 2121–26. The Upper Reaches encompasses approximately 10,000 acres of land in

---

[3] The administrative record has been filed in the record at R. 28. The record consists of several PDF files, each labeled "NATIONAL_REG." For ease of reference, the Court refers to the administrative record as "NR," followed by the page number listed on the document.

both Clark County and Fayette County, divided into approximately 157 separate parcels of property. *See Norton v. Perry*, Nos. 2009-CA-2343-MR, 2009-CA-2394-MR, 2013 WL 310159, *1 n.3 (Ky. Ct. App. Jan. 11, 2013).[4]

Marty Perry, an employee with the SHPO office, processed the nomination packet. NR pp. 2056–57. After an initial review of the nomination, Mr. Perry requested that the Heritage Committee make certain revisions. *Id.* at 2057. The Heritage Committee made the necessary changes, and Mr. Perry began to prepare the nomination packet for submission to the State Review Board. *Id.* at 2056–58. As an initial matter, he sent written notice to the property owners. Because the nominated district included more than fifty property owners, federal regulations required only "general notice" to property owners in the form of a published notice. 36 C.F.R. §§ 60.6(c)–(d); *see also* NR p. 2063. However, in addition to publishing an advertisement in the local newspaper, Mr. Perry mailed a notification letter to the address of record for all known property owners and mailed a similar letter to the appropriate local officials. NR pp. 319, 2060, 2063. The notice letter advised the property owners of an upcoming informational meeting and the State Review Board's upcoming meeting, and it invited objecting landowners to submit notarized letters of objection before the Board's August 27, 2008 meeting. *Id.* at 319.

On August 14, 2008, the SHPO held a public informational meeting at Boone's Creek Baptist Church in Fayette County, Kentucky. *Id.* at 319, 2063–64, 2082. After the informational meeting, the nomination packet was forwarded to the State Review Board. The Board discussed the nomination at its regularly scheduled meeting in Russellville, Kentucky on August 27, 2008. *Id.* at 319, 2072. Though the location of the meeting was approximately three hours from the Upper Reaches, several of the property owners attended the meeting and presented their written

---

[4] On December 11, 2013, the Supreme Court of Kentucky denied discretionary review and ordered that the Court of Appeals' decision be de-published.

and notarized objection letters. *Id.* at 2072, 2138–40. As a result, the Board tabled the nomination and asked the SHPO to conduct additional public outreach before resubmitting the nomination. *Id.* at 2072.

Around this time, some property owners, through counsel, began submitting additional written objections to the SHPO office. *Id.* at 2130; *see also id.* at 317–419 (objection letters). On September 26, 2008, counsel for the property owners wrote to Mr. Perry, advising that they had obtained objection letters from 129 landowners, or stated another way, objections relating to ninety-five out of the 157 property addresses listed. *Id.* at 297. The property owners felt that they had therefore "submitted objection letters for well over 50% of the owners, the properties and the land mass, any way you choose to count them," and as a result, the nomination process should stop. *Id.* The letter also expressed the property owners' disappointment in learning that at least one property owner declined to submit an objection because Mr. Perry had advised the property owner that he would be "wasting his time" because "there would never be objections obtained to amount to over 50%." *Id.* at 298.[5]

The SHPO office responded by letter dated October 28, 2008, stating that it was required to submit the nomination to the Keeper for a determination of eligibility, regardless of whether a majority of property owners objected. *See Norton*, 2009-CA-2394-MR, 2013 WL 310159, at *2.[6]

---

[5] Mr. Perry testified that he recalled having a conversation with a property owner early in the nomination process. *Id.* at 2079–80. The property owner asked about submitting an objection letter. *Id.* at 2079. At that point, Mr. Perry had only received one or two objection letters, and he "gave a prediction to" the caller that the nomination would receive a lot of support. *Id.* at 2079–80. Mr. Perry testified, "[S]o I communicated to him that if his—if he was trying to save himself time, then he probably wouldn't send in a letter of objection, but if he wanted to object, that we would receive it and would respect it." *Id.* at 2080. Regardless, the record indicates that the property owner (identified by Plaintiffs as Harold Black) submitted an objection for his property, and his objection was included in the final count. *Id.* at 429.

[6] This letter is not included in the administrative record. However, the Court of Appeals details the SHPO's response, and Defendants do not dispute this description of the SHPO's response.

The SHPO office further explained that the State Review Board would make a note of the objections in its meeting minutes, but it would still render a recommendation to the Keeper regarding eligibility for listing. *Id.*

### C.  Fayette Circuit Court Injunction

On November 26, 2008, a group of six landowners[7] filed suit in Fayette Circuit Court against the Commonwealth of Kentucky, the Kentucky SHPO, the Heritage Committee, Mr. Perry, and others.[8] NR pp. 1899–911. The state court plaintiffs alleged unconstitutional taking, due process violations, trespass, conversion, defamation, and unjust enrichment, and requested an injunction, declaratory relief, and damages. *Id.*

On December 5, 2008, the circuit court entered a temporary injunction against the state court defendants. *Id.* at 1916. This injunction prevented the Kentucky State Review Board from considering the nomination at its December 2008 meeting. *Id.* at 2076. The state court defendants then filed motions to dismiss. *See id.* at 1912–1915. The circuit court deferred ruling on the motions to dismiss but dissolved the temporary injunction in an order signed March 25, 2009. *Id.* at 1916. The Board was therefore permitted to consider the nomination at its May 2009 meeting. *Id.*

### D.  Submission of the Nomination to the Keeper of the National Register of Historic Places

Mr. Perry testified that, in anticipation of the May 2009 Board meeting, the SHPO again mailed written notices to an updated list of property owners. *Id.* at 2082–84. A second public informational meeting about the nomination was held in April 2009 in Becknerville, Kentucky. *Id.* at 2082. Approximately twenty to twenty-five members of the public attended the

---

[7] The six state court plaintiffs are also plaintiffs in the present matter.

[8] None of the present defendants were named in the state court lawsuit.

informational meeting and were provided an opportunity to ask questions about the nomination process. *Id.* at 2086–88.

Around this time, Mr. Perry reached out to the National Register of Historic Places for guidance in calculating the number of property owners and objections. *Id.* at 2087. On April 30, 2009, he contacted the National Register by email, asking about the appropriate way to count the objections of entities like limited partnerships, corporations, LLC, trusts, and estates. *Id.* at 438. An employee with the National Register replied that such entities "are treated as single owners, with one vote," even if an entity owns multiple plots of land. *Id.* at 438. However, "[i]f a husband and wife or any number of individuals are named on the deed or tax record as owners, they each get a vote for counting purposes." *Id.* Mr. Perry also asked whether the National Register would accept a photocopied objection letter, rather than an original. *Id.* at 438. To this question, the National Register's office replied that the office would accept only original, notarized objection letters. *Id.* at 439.

Soon after, the State Review Board gathered for its May 12, 2009 meeting. Several members of the public attended and voiced their objections to the nomination. *Id.* at 2152, 2079. The State Review Board ultimately voted unanimously to approve the nomination of the Upper Reaches of Boone Creek. *Id.* at 2079.

On June 9, 2009, the SHPO submitted the nomination to the Keeper. *Id.* at 441. In the letter to the Keeper, the SHPO explained that "[a] significant number of owners objected to the nomination of the Upper Reaches of Boones [sic] Creek Historic District. The count of owners and objections was complicated by numerous types of ownership and by individuals who owned more than one parcel submitting multiple objections." *Id.* The SHPO then provided the written

objections, as well as a spreadsheet that the SHPO office used to keep track of the objections "so [the Keeper] can verify our conclusion that a majority has not objected." *Id.* at 441–49.

The SHPO's spreadsheet shows that the SHPO calculated a total of 182 landowners and ninety-one objections. *Id.* at 442. At that time, counsel for the property owners claimed a total of 103 objections. *Id.* The SHPO disallowed nine of those objections, however, because the objector was no longer a property owner; the objector was an LLC which received only one vote regardless of the number of properties owned; or the objector held only a remainder interest in the property and therefore was not entitled to a vote. *Norton*, 2013 WL 310159, at *3. Three objections were also withdrawn. NR p. 442. As a result, the SHPO acknowledged only ninety-one objections in its nomination packet. *Id.*

After submitting the nomination to the Keeper, the SHPO continued to evaluate its calculation of owners and objections. On June 12, 2009, Mr. Perry emailed the Historian of the National Register and explained that there existed "a property with a current owner who has a life estate interest in it." *Id.* at 451. That owner, Patsy, had agreed to pass the property on to another individual, Mary, and Mary's husband when she died. *Id.* Mr. Perry also explained that "[t]he County Tax office only acknowledged Patsy as the owner." *Id.* Mr. Perry then asked whether "we have 1 owner (Patsy) or 3 owners (Patsy, Mary, and Mary's husband)?" *Id.* He also noted that Patsy owns six different pieces of property within the Upper Reaches, "yet only has this life estate arrangement on 2 of them." *Id.* Patsy, Mary, and Mary's husband each objected to the Upper Reaches' nomination. *Id.* at 451–52. "To put a little more drama into the question," he noted, "[o]ur current count is 182 owners and 91 objections." *Id.* at 452.

The Historian replied that "it is our opinion that what Patsy has is not a life estate, it is a fee-simple conditional ownership." *Id.* at 451. The Historian's explanation for this conclusion

- 11 -

was that "Patsy owns (and pays taxes) on the property, but has preconditioned the deed to pass to specified persons. They do not own the land, and according to the tax roll, they are not responsible for the taxes." *Id.* The Historian therefore concluded that Patsy is the only owner and has a single vote for all six of her properties. *Id.*

### E.  Return of the Nomination

Meanwhile, in response to the State Review Board's approval of the nomination, the state court plaintiffs asked the Fayette Circuit Court to enjoin the state court defendants from forwarding the nomination to the Keeper. The circuit court did not grant the motion, but it did enter an order requesting that the state court defendants have the nomination returned from the Keeper. *Id.* at 455.

On June 30, 2009, the SHPO complied with the circuit court's directive and requested that the Keeper return the nomination for the Upper Reaches "for further review of the counting of landowners and objections." *Id.* In response, the National Register returned the nomination to the SHPO on or about July 7, 2009 so that the SHPO could "clarify any possible procedural errors involving the counting of landowners and objections." *Id.* at 456.

On September 5, 2009, proponents of the listing petitioned the Keeper to accept the previously submitted nomination or, alternatively, appealed the SHPO's failure to resubmit the nomination. *Id.* at 459–842. Shortly after the petition/appeal was filed, Mr. Perry emailed the National Register. *Id.* at 843–44. He explained that a hearing was scheduled for September 9, 2009 in Fayette Circuit Court, and counsel for the property owners continued to submit new objection letters to the court. *Id.* at 844. Mr. Perry explained that "we need a strong voice to empower us, something that could force the process of receiving owner objections to have an end

date so that we can forward the [nomination] form to your office." *Id.* He posed the following

questions to the National Register:

> What is your office's position about these late-arriving objections? Can we tell the judge tomorrow at the hearing that you have instructed us to forward to you the nomination with all objections received to date, with the further instruction that owners should forward to the Register any additional objections, until the Register has taken action on the nomination?

*Id.*

The National Register's historian replied, "We cannot 'instruct' you to forward the

nomination unless there is something that compels [sic] us to do so under 36 CFR 60, such as a

nomination appeal." *Id.* at 843. He also explained that the SHPO must compile the list of owners

and certify that the proper procedures have been followed. *Id.* He further advised that he would

accept any notarized letters of objection or support, and "[i]deally, such objections that come in

'late' should be handled by the SHPO, who in turn would forward them to us." *Id.*

### F. Fayette Circuit Court Hearing and Resubmission of the Nomination

At the Fayette Circuit Court's September 9, 2009 hearing,[9] the property owners cited

ninety-two objection letters. *Norton*, 2013 WL 310159 at *3. The state court defendants,

however, calculated eighty-eight objections and 184 landowners. *Id.* The state court defendants

provided the following explanation as to how these numbers had changed so dramatically since

the State Review Board's May 2009 meeting, at which time the Board recognized ninety-one

objections and 182 landowners. As to the number of landowners, the state court defendants

explained that, after the Board's May 2009 meeting, they recognized two additional owners that

had been overlooked, bringing the total to 184 landowners. *Id.* As to the number of objections,

the state court defendants explained that 103 objections had been submitted but nine had been

---

[9] The substance of the hearing is described in the Kentucky Court of Appeals' January 11, 2013 opinion. The parties do not dispute the description provided by the Court of Appeals.

rejected because the objector was no longer a property owner; the objector was an LLC that received only one vote; or the objector held only a remainder interest in the property. *Id.* Another three objections had been withdrawn. *Id.* This brought the total number of objections to ninety-one, the number recognized by the Board. However, the state court defendants rejected additional objections, and some objections were withdrawn, bringing the total to eighty-four. *Id.* Then, at the circuit court hearing, the property owners presented four new objections, bringing the total to eighty-eight objections. *Id.*

At the hearing, the property owners argued that the constantly changing numbers of property owners and objections was inherently unfair. *Id.* For example, they argued that the lack of a set deadline for counting owners and objections mean that the entire count could fluctuate indefinitely. *Id.* They also took issue with the fact that two objections had been disallowed because the properties were held in a life estate, and there was no federal regulation that limited LLCs to a single vote. *Id.*

On September 11, 2009, after the Fayette Circuit Court hearing,[10] the SHPO resubmitted the nomination for the upper reaches of Boone Creek, this time calculating a total of 184 property owners and ninety objections. NR pp. 845–46. As a result, the petition/appeal to the Keeper was denied as moot. *Id.*

### G.  Fayette Circuit Court Opinion and Dismissal

After the September 9, 2009 hearing, the Fayette Circuit Court questioned whether it had jurisdiction to decide an issue involving federal regulations. *Id.* at 1950. On November 3, 2009, the Fayette Circuit Court dismissed the state court suit with prejudice, citing "a fundamental

---

[10] It is not clear from the record provided to this Court or from the Court of Appeals' description of the hearing whether the circuit court judge ruled from the bench or took the matter under submission; however, the circuit court did not enter an order addressing the parties' motions until November 3, 2009.

issue of jurisdiction." *Id.* Nevertheless, the Court, in dicta, expressed its concerns with the

nomination procedures:

> [T]he Court expresses due process concern with respect to the federal regulations
> depriving landowners of property rights "to be left alone" and "the right not to have
> your property designated as something that you object to under the process." The
> Court further states that the process is fundamentally flawed as being arbitrary and
> unclear in the manner in which it deals with objections to listing in a National
> Register Historic District and the counting of those objections. However, having
> found no error with the administration of the regulation by the Defendants and in
> light of jurisdictional issues, the Court hereby dismisses this action with respect to
> all Defendants.

*Id.* The Court later denied a motion by the state court plaintiffs to alter, amend, or vacate the

order. *Id.* at 1953.

### H. Extension of the Comment Period and Listing of the Property in the National Register of Historic Places

After the SHPO resubmitted the nomination to the Keeper, the objecting property

owners[11] petitioned the Keeper to extend the comment period for the nomination, and the Keeper

complied, extending the comment period through November 27, 2009. *Id.* at 851–53, 1501.

During this comment period, counsel for the property owners submitted additional objection

letters, noting that he counted ninety-four objections. *Id.* at 863–894.

On November 27, 2009, the extended comment period expired, and the nomination was

then reviewed by the Keeper's office. *Id.* at 1501. The Keeper ultimately found that "[t]he

nomination adequately documents the local significance of the District in Agriculture." *Id.* It was

also noted that "[t]he objection count as of listing [on November 27, 2009] was 90/183." *Id.*

In a November 27, 2009 letter to counsel for the property owners, the Chief of the

National Register explained the objection tally. *Id.* at 978–79. He first noted that the SHPO had

---

[11] More specifically, the petition for extension of the comment period was filed by counsel for the six state court plaintiffs (each of who is a plaintiff in the present matter). *See* NR 852–53.

affirmed a total of 184 landowners and ninety objections. *Id.* at 978. However, during the comment period, the National Register received additional objection letters, notices of ownership, and withdrawals of objections. *Id.* Specifically, it received letters from Cargill, Inc. citing their ownership of two properties. *Id.* Given Cargill's status as a corporation with only one vote regardless of the number of properties owned, this brought the number of property owners to 183 and the number of objections to ninety-one. *Id.* The National Register then received an additional objection letter, bringing the total objections to ninety-two. *Id.* Lastly, the National Register received notice that a property owner supported the nomination. *Id.* That property had previously been owned by a husband and wife, both of whom had submitted objections. *Id.* Because they were no longer the property owners, their objections were withdrawn. *Id.* With these changes, the National Register counted a total of 182 landowners and ninety-objections,[12] or less than fifty percent. *Id.*

The Upper Reaches of Boone Creek was listed in the National Register of Historic Places on November 27, 2009. *Id.* at 897. A few days later, on November 30, 2009, the Historian of the National Register emailed Mr. Perry, attaching the tally of objections provided by the property owners' attorney (which identified ninety-four objections) and asking, "How does it jibe with yours?" *Id.* at 951. Mr. Perry reviewed the count and acknowledged that there was a total of ninety objections after invalid and withdrawn objections were removed from the list. *Id.* at 952–53. The Historian replied that he was "just curious," and the office had used the SHPO's count in the nomination form as the "official baseline." *Id.* at 954. He also agreed that additional changes

---

[12] As noted above, the Keeper stated that there existed 183 landowners and ninety objections at the time of listing on November 27, 2009. NR p. 1501. It appears that this discrepancy may result from either a mere typo or a difference in the calculation of owners upon the receipt of Cargill's letter. If Cargill, which owned two properties, was listed twice on the owners list, then the owners list would be reduced by one upon receipt of its letter, resulting in a total of 182 landowners. If Cargill was only listed once on the owners list, then its letter would not affect the owners list, which would remain at 183. Regardless, less than fifty-percent of the owners filed objections.

had been made after the nomination had been submitted to the Keeper, including removing invalid and withdrawn objections, and the count had been adjusted accordingly. *Id.* "So," he explained, "the end count was 90 objections out of 183 owners as affirmed by the SHPO. 49% - less than a majority, so by regulation, the district was listed." *Id.*

## I.   Post-Listing State Court Appeal and Remand to Fayette Circuit Court

Meanwhile, the state court plaintiffs appealed the Fayette Circuit Court's November 3, 2009 dismissal order. On January 11, 2013, the Court of Appeals of Kentucky reversed the circuit court's dismissal of the case and remanded for further proceedings. *Norton*, 2013 WL 310159 at *17; *see also* NR 1989–991. The Court of Appeals held that the Fayette Circuit Court did have jurisdiction over the underlying suit, including the issues arising out of federal law. *Norton*, 2013 WL 310159 at *5–6. After addressing the defendants' mootness, exhaustion, and personal jurisdiction claims and ruling in favor of plaintiffs on each issue, the Court of Appeals addressed the plaintiffs' constitutional claims.

With respect to the due process claim, the Court of Appeals "agree[d] with the trial court that the process used by [the defendants] to assess the number of property owners and the corresponding number of objections is fundamentally flawed." *Id.* at *15. The court explained, "It is arbitrary and unclear because there is no fixed time at which the number and names of the landowners are determined at a reasonable time prior to the hearing, thus leading to a continual fluctuation in the number of landowners and required objections." *Id.* at *16. The court also noted that the defendants

> failed to provide any citation to any regulations that enumerate that trusts, estates, LLCs, and LPs are only entitled to a single vote while, in contrast, a husband and wife each have a vote regardless of how the title is held. We believe that without these written guidelines, the [defendants'] discussion with the NPS as to how to treat the votes disallowed is fundamentally arbitrary and in violation of [the

plaintiffs'] due process rights because the statute, as written, does not provide a meaningful right to be heard.

*Id.* However, the Court of Appeals explained that it was "in agreement with the trial court that the Appellees did not misapply the administration of the regulations." *Id.*  Instead, the court "[found] said regulations to be inadequate by their failure to address the counting of votes concerning trusts, estates, LPs, and LLCs and the fixing of a definite time for designation of the number of parcels of land and the landowners entitled to participate." *Id.* The Court of Appeals therefore reversed the trial court's dismissal order and remanded for further proceedings. *Id.*

On remand, the Fayette Circuit Court granted summary judgment in favor of the state court plaintiffs. NR pp. 2173–79. In its order, dated September 13, 2016, the circuit court explained that it was bound by the Court of Appeals' decision on the due process issue. *Id.* at 2176. Accordingly, the circuit court granted the plaintiffs' motion for summary judgment on the due process claim "as to liability only." *Id.*

### J.  Petition to Remove the Property from the National Register

By letter dated October 28, 2016, property owners (now the plaintiffs) submitted a petition to the Keeper, asking that the Upper Reaches of Boone Creek be removed from the National Register of Historic Places.[13] *Id.* at 965–68. In the letter, the petitioners explained that they brought the removal petition under 36 C.F.R. § 60.15(a)(4) based on "prejudicial procedural error in the nomination or listing process." *Id.* at 966. The petitioners further explained their belief that "the process, request for listing and listings are in violation of 60.15(a)(4) and this

_____

[13] As the property owners submitted their petition for removal to the Keeper (and then, to the SHPO for submission to the Keeper), the state court plaintiffs sought direction from the Fayette Circuit Court. On October 28, 2016, the state court plaintiffs filed a Motion to Require Defendants to Take All Steps Necessary to Delist the Plaintiffs' Property from the National Register of Historic Places and to Reinstate Injunction as Permanent. [R. 1-12] The Fayette Circuit Court conducted a hearing on the motion on January 23, 2017. [R. 1-13, p. 1] Though the circuit court did not formally enter an order on the motion until May 15, 2017, the court apparently granted the motion at the hearing upon learning that the SHPO planned to send the removal petition to the Keeper that same day. *Id.* at 1–2.

'process' should never have been initiated or perpetuated, and certainly not completed." *Id.*

Quoting heavily from the Kentucky Court of Appeals' due process analysis, the petitioners stated

that "a Court of competent jurisdiction has determined that there were procedural irregularities in

the nominating process. This forecloses any further argument on the issue and requires delisting

of the Property under the applicable regulations and law." *Id.* at 967.

In response, the Keeper's office advised that the petitions for removal must first be

submitted to the SHPO under 36 C.F.R. § 60.15(c) and the SHPO must then provide notice to

affected property owners under § 60.15(d)–(h). *Id.* at 1091. The petitioners then submitted their

removal petition to the SHPO. *Id.* at 1369.

After complying with the regulations regarding notice, the SHPO submitted the removal

petition to the Keeper. *Id.* at 1369, 1107–1165. The SHPO explained that the petition sought

delisting of the property "on procedural ground[s] under 36 C.F.R. 60.15(a)(4)." *Id.* at 1108. It

also explained that the

> [t]he Kentucky Court of Appeals and Fayette Circuit Court have found that the
> federal regulatory process used for the district violated the plaintiff owners' due
> process rights, and these opinions are binding. The state courts have spoken
> unequivocally, and delisting is appropriate in this circumstance. . . . [W]e see no
> reason why the district should not be removed from the National Register of
> Historic Places.

*Id.*

The Keeper received the petition on January 27, 2017. *Id.* at 1108, 1369. By letter dated

March 13, 2017, the Keeper denied the petition for removal. *Id.* at 1369–72. The Keeper's letter

first addressed whether the SHPO had complied with the National Register regulations. *Id.* at

1369–70. The Keeper explained that it believed the SHPO "followed the nomination procedures

prescribed in 36 C.F.R. § 60.1 et seq." *Id.* at 1369. Specifically, the Keeper found that the SHPO

properly identified the property owners, appropriately utilized tax records to identify the owners

- 19 -

within ninety days prior to the State Review Board's consideration of the nomination, and notified the owners by mail within the timeframe listed in the regulations. *Id.* The Keeper also noted that the SHPO held an informational meeting, which is suggested but not required by the regulations. *Id.*

As to the tallying of owners and objections, the Keeper found that the SHPO "tallied the total number of property owners that met the definition of 'owner' in 36 C.F.R. § 60.3(k)" and "counted the notarized objections that met the requirements of 36 C.F.R. § 60.6(g)," including objections received before and after the State Review Board's meeting. *Id.* at 1369–70. The Keeper also noted that the SHPO had certified that less than fifty-percent of the owners submitted objections. *Id.* at 1370.

The Keeper's letter also addressed the state court litigation and the due process concerns of the state courts. *Id.* at 1370–72. First, the Keeper concurred with the state courts' findings that "the [SHPO] did not misapply the administration of the regulations." *Id.* at 1370 (quoting *Norton*, 2013 WL 310159, at *16) (internal quotation marks omitted). The Keeper next acknowledged the Court of Appeals' conclusion that the process outlined in the regulations is "fundamentally flawed" and "arbitrary and unclear because there is no fixed time at which the number and names of the landowners are determined at a reasonable time prior to the hearing, thus leading to a continual fluctuation in the number of owners and required objections." *Id.* (quoting *Norton*, 2013 WL 310159, at *15). The Keeper also cited the Court of Appeals determination that the regulations were inadequate because they failed to address how the votes of trusts, estates, LPs, and LLCs should be counted and failed to fix a definite time for designating the number of property owners. *Id.* (quoting *Norton*, 2013 WL 310159, at *16) (internal quotation marks omitted).

In response to these holdings by the Court of Appeals, and the petitioners' reliance on them, the Keeper first noted that the "regulations do provide a fixed time for identifying landowners." *Id.* In support, the Keeper cited 36 C.F.R. § 60.6(c). That provision provides that "[t]he list of owners shall be obtained from either official land recordation records or tax records, whichever is more appropriate, within 90 days prior to the notification of intent to nominate." Further, the Keeper argued, the regulations address changes in ownership, citing 36 C.F.R. § 60.6(g), which states that an owner whose name did not appear on the list of owners may "certify[y] in a written notarized statement that the party is the sole or partial owner of a nominated private property such owner," and that owner "shall be counted by the State Historic Preservation Officer in determining whether a majority of owners has objected." The Keeper explained,

> This process ensures that all persons who own nominated property have the opportunity to have their voice heard prior to listing. This includes persons who become owners during the nomination process but prior to the listing determination, who are afforded the opportunity to object to the nomination or, if they do not agree with an objection submitted by a previous owner, to rescind that objection. The fact that, during its extended comment period, the National Register received letters from new owners objecting to the listing and rescinding the objections of previous owners, demonstrates the clarity of this section of the regulations.

*Id.*

Next, the Keeper argued that the "regulations are clear with respect to how owners are counted," citing 36 C.F.R. § 60.3(k). *Id.* That provision defines owners as "those individuals, partnerships, corporations or public agencies holding fee simple title to property." 36 C.F.R. § 60.3(k). Thus, the Keeper concluded, life estate holders (or holders of an easement or lease) are not "owners" as defined by the regulations. NR p. 1370. Then the Keeper concluded that

> [t]rusts, LPS, LLCs, and estates that hold fee simple title to land do fall within the definition of an owner and are considered corporate owners. A corporate owner is entitled to the same vote as an owner who is a natural person. Thus, each corporate

owner gets one vote, regardless as to whether that owner is a corporation, LLC, partnership, or trust.

*Id.*

This explanation necessarily relies on the Keeper's subsequent citation to 36 C.F.R. § 60.6(g). That provision provides in part that "[e]ach owner of private property in a district has one vote regardless of how many properties or what part of one property that party owns and regardless of whether the property contributes to the significance of the district." Thus, the Keeper concluded, "the regulations are clear that the number of parcels owned by an individual owner or owners is not relevant to the calculation of the total number of owners objecting to the listing." NR p. 1371. That same provision also provides that, "[u]pon notification, any owner or owners of a private property who wish to object shall submit to the State Historic Preservation Officer a notarized statement certifying that the party is the sole or partial owner of the private property, as appropriate, and objects to the listing." 35 C.F.R. § 60.6(g). Based on this language, the Keeper argued that "the regulations are also clear as to how votes objecting to a listing nomination should be submitted." NR p. 1371.

Accordingly, the Keeper found

that the SHPO's efforts to identify, notify, and inform owners meets the spirit and letter of the 1981 National Register regulations. The 1981 National Register regulations are clear and afford property owners due process throughout the notification, review, and comment periods. The Kentucky Court of Appeals decision on which your petition relies was based on an incorrect and incomplete understanding of the provisions in the regulations.

*Id.* at 1372. The Keeper further explained that it "did not find any evidence of a prejudicial procedural error by the Kentucky SHPO or by the Office of the Keeper of the National Register." *Id.* Because the petition did not allege any other grounds for removing the property from the National Register, and the Keeper found no other grounds for removal, the Keeper denied the

- 22 -

petition for removal. *Id.* As a result, the Upper Reaches of Boone Creek remains listed on the National Register of Historic Places.

### K.  The Present Lawsuit

On August 23, 2017, several property owners who objected to the listing of the property filed this suit against the United States Department of the Interior, the Secretary of the Interior, the National Park Service, and the Keeper. [R. 1] In the Complaint, Plaintiffs petitioned for judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (Count I); alleged that Defendants' actions and inactions violated Plaintiffs' rights to substantive and procedural due process (Count II); petitioned for a writ of mandamus compelling the Keeper, the Secretary of the Interior, and the National Park Service to delist the property and hold that the property is not eligible for listing (Count III); and petitioned for a permanent injunction compelling the Keeper, the Secretary of the Interior, and the National Park Service to delist the property and hold that the property is not eligible for listing (Count IV). [R. 1, pp. 9–11] Plaintiffs also requested attorneys' fees (Count V). *Id.* at 12.

On November 22, 2017, Defendants moved to dismiss the Complaint, arguing that the Court lacked subject matter jurisdiction because Plaintiffs' claims are time-barred and Plaintiffs lack standing. [R. 12-1, pp. 15–18] Defendants also argued that Plaintiffs failed to state a claim under the APA and failed to state a claim for due process violations. *Id.* at 18–22. Defendants further argued that Plaintiffs failed to allege facts that warrant a writ of mandamus, and regardless, that claim must fail because the APA provides an adequate remedy, thereby precluding mandamus relief. *Id.* at 22–25. Lastly, Defendants argued that the request for injunctive relief and attorneys' fees must fail because they are not independent causes of action,

but rather, forms of relief awarded when a plaintiff prevails on the merits of a claim, and in this case, Plaintiffs' underlying claims are without merit. *Id.* at 25.

On March 15, 2018, the Court entered an order granting in part and denying in part Defendants' motion to dismiss.[14] [R. 19] The Court granted the motion to the extent it sought dismissal of Plaintiffs' claim for a writ of mandamus. *Id.* at 9–10. The Court explained that a writ of mandamus is only available if there is no other adequate remedy available to Plaintiffs, but in this case, the APA provides an adequate alternative remedy. *Id.* However, the Court found no merit to Defendants' arguments on subject matter jurisdiction and the sufficiency of the allegations. *Id.* at 5–9. The remaining claims (involving review under the APA, due process violations, and injunctive relief) were therefore allowed to move forward. *Id.* at 10.

Plaintiffs have now filed a Motion for Summary Judgment, [R. 47], and Defendants have responded with a Cross-Motion for Summary Judgment, [R. 50]. The motions have been fully briefed, [R. 51, R. 54, R. 55, R. 56], and the matter is ripe for review.

## II.  STANDARD OF REVIEW

Other courts have held that "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [APA] standard of review." 2 Am. Jur. Admin. Law § 544 (2021); *see also Northwest Motorcycle Ass'n v. United States Dept. of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *Block v. Powell*, 227 F. Supp. 2d 25, 30–31 (D.D.C. 2002). However, "due to the limited role of the court in reviewing the administrative record, the typical summary judgment standards set

---

[14] Chief Judge Danny C. Reeves was originally assigned to this case and entered the March 15, 2018 Order.

forth in the relevant Federal Rule of Civil Procedure are not applicable."[15] 2 Am. Jur. Admin.

Law § 544. Instead, the agency is responsible for resolving factual issues and reaching a decision

that is supported by the administrative record, and the reviewing court "is to determine whether

or not, as a matter of law, the evidence in the administrative record permitted the agency to make

the decision it did." *Id.* (citation omitted); *see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76,

90 (D.D.C. 2006).

The Sixth Circuit has expressed similar concerns about the application of the traditional

summary judgment standard in the context of an administrative action under the APA. *See*

*Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 480 (6th Cir. 1999). As one court in this circuit

has explained, "The Sixth Circuit's primary concern is that review of agency decisions via

motions for summary judgment 'invites improper consideration of evidence outside the

administrative record and reliance upon post hoc rationalizations for the agency's action.'"

*Sierra Club v. United States Forest Service*, 2015 WL 5729091, *4 (E.D. Mich. Sept. 30, 2009)

(quoting *Alexander*, 165 F.3d at 480). Thus, when a district court rules on a motion for summary

judgment under the APA, it must apply the proper standard of review outlined in the APA, and

its review must be based on the administrative record. *Id.* (citing *Alexander*, 165 F.3d at 480–81;

*City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007); *Taco Especial v. Napolitano*, 696

F. Supp. 2d 873, 877 (E.D. Mich. 2010)); *see also Donaldson v. United States*, 109 F. App'x 37,

40 (6th Cir. 2004) (citing *Alexander*, 165 F.3d at 480). In this sense, "summary judgment 'serves

as the mechanism for deciding, as a matter of law, whether an agency action is supported by the

administrative record and is otherwise consistent with the APA standard of review.'" *Singh v.*

---

[15] Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

*Johnson*, No. 15-cv-12957, 2016 WL 3476701, *3 (E.D. Mich. 2016) (quoting *Resolute Forest*

*Prods., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 106 (D.D.C. 2016)).

Under the APA's standard of review, the reviewing court must "hold unlawful and set

aside agency action, findings, and conclusions" that it finds to be "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The reviewing

court must also hold unlawful and set aside agency action that it finds to be contrary to a

constitutional right or in excess of the agency's jurisdiction or authority, or if the agency acted

"without observance of procedure required by law." *Id.* § 706(2)(B)–(D). The specifics of this

standard of review are discussed in more detail in the Court's analysis.

The APA further provides that "the court shall review the whole record or those parts of

it cited by a party, and due account shall be taken of the rule of prejudicial error."[16] *Id.* § 706.

Under the rule of prejudicial error, "[r]eversal [of the agency's action] is not required by the fact

that an agency made an 'error' if it is shown that the error was not 'prejudicial.'" *Braniff*

*Airways, Inc. v. C.A.B.*, 379 F.2d 453, 465 (D.D.C. 1967) (quoting *O'Kon v. Roland*, 247 F.

Supp. 743, 746 (S.D.N.Y. 1965)). As one Court has explained, "If an agency's mistake did not

affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and

remand for reconsideration." *PDK Labs, Inc. v. United States D.E.A.*, 362 F.3d 786, 799 (D.C.C.

2004); *see also Manalapan Mining Co., Inc. v. Director, Office of Workers' Compensation*

*Programs*, 841 F. App'x 922, 927 (6th Cir. 2021) (reciting prejudicial error rule).

With these principles in mind, the Court addresses the parties' arguments.

---

[16] In the present case, the administrative record has been filed with the Court. [R. 28] To the extent this opinion's "background" section cites sources not included in the administrative record, the Court notes that it included this information to provide a comprehensive overview of the complex factual and procedural background of this case. However, in reviewing the agency's actions under the APA, the Court considers only the administrative record. *See Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984))).

### III.  ANALYSIS

In the present case, Plaintiffs argue that the denial of the removal petition was arbitrary and capricious because the defendants failed to conduct any meaningful review of the objections or the SHPO's calculation of the number of landowners and objections; the defendants' denial of the removal petition was based on regulations that are inconsistent with the governing statutes; and the denial of the removal petition violates Plaintiffs' procedural and substantive due process rights. In response, Defendants argue that the Keeper's denial of the removal petition was not arbitrary and capricious; the regulations at issue are consistent with the NHPA; there is no constitutionally cognizant injury to support Plaintiffs' due process claims, and regardless, there was no denial of due process.  Defendants also contend that Plaintiffs lack standing; Plaintiffs' claims are time-barred to the extent Plaintiffs challenge the 2009 listing decision and the regulations; and Plaintiffs' requested relief is unavailable or otherwise contrary to law.

The Court first addresses the threshold issues of standing and timeliness before considering the remaining arguments.

#### A.  Standing

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has explained that this provision of the APA "impose[s] a prudential standing requirement in addition to the requirement imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact." *National Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (citation omitted). It does not, therefore, alter the basic principle that one must suffer an injury-in-fact to satisfy standing requirements. *See Los Angeles Customs & Freight Brokers Ass'n v. Johnson*,

277 F. Supp. 525, 534 (C.D. Cal. 1967) ("It is clear that the Administrative Procedure Act has in no way altered the basic principle that one must have suffered a 'legal wrong' in order to have standing to challenge the Government action." (citations omitted)). Stated another way, one must demonstrate both constitutional standing under Article III of the Constitution and prudential standing under the APA to secure judicial review of an adverse agency action. *See* 2 Am. Jur. Admin. Law § 402.

### 1. Constitutional Standing Under Article III

To demonstrate Article III standing, the plaintiff must satisfy three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The first element requires that the plaintiff suffer an "injury in fact," or "an invasion of a legally protected interest," that is (1) concrete and particularized and (2) actual or imminent, not merely conjectural or hypothetical. *Id.* (citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)). Lastly, it must be likely—not merely speculative—that the injury will be redressed by a favorable outcome in the litigation. *Id.* at 561 (citation omitted). The "gist" of Article III's standing requirement is to ensure that "the [litigants] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 205 (1962).

In the present case, Defendants focus on the injury-in-fact requirement of constitutional standing, arguing that Plaintiffs fail to demonstrate this necessary element. Defendants made this

same argument earlier in the case, when moving for dismissal under Rule 12(b). [R. 12] The

Court ultimately found that

> [t]he plaintiffs have alleged concrete and particularized injury in the form of
> discouragement of the destruction of historic buildings by eliminating certain
> otherwise available Federal tax provisions both for the demolition of historic
> structures and for new construction on the site of demolished historic buildings, and
> applicability of the Surface Mining and Control Act of 1977 which requires
> consideration of a property's historic values in determining whether to issue a
> surface coal mining permit.

R. 19, p. 6–7. Thus, the Court explained, "[t]he plaintiffs who are owners of the involved

property are clearly alleging injury to [a] protected interest in property ownership and use." *Id.*

Further, the Court noted,

> [T]he regulatory scheme of the [NHPA] is intended to provide a procedural avenue
> to object to the inclusion of the district on the register.  If the owners of the property
> directly affected by the decision to list or delist the property in the National Register
> do not have standing, it would be hard to imagine that anyone would have standing
> to oppose a decision by the Keeper, thus rendering the procedural mechanisms to
> object meaningless.

*Id.*

In that prior order, the Court reviewed Defendants' standing arguments under Federal

Rule of Civil Procedure 12, and it therefore considered whether Plaintiffs had properly *alleged*

standing. *See Lujan*, 504 U.S. at 561. Now, at the summary judgment stage, the plaintiffs "must

'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for

purposes of the summary judgment motion will be taken to be true." *Id.*

In their Cross-Motion for Summary Judgment, Defendants repeat their earlier standing

arguments, and again argue that Plaintiffs have failed to identify a cognizable injury. [R. 51-1,

pp. 45–47] Specifically, Defendants argue that Plaintiffs have not demonstrated any harm

suffered due to the denial of the removal petition, and they further claim that listing on the

National Register imposes no restrictions on the listed property's owners. *Id.* at 45–47. For

- 29 -

support, Defendants cite to 36 C.F.R. § 60.2, which states in part that "[l]isting of private property on the National Register does not prohibit under Federal law or regulation any actions which may otherwise be taken by the property owner with respect to the property."

As an initial matter, the Court acknowledges that 36 C.F.R. § 60.2 states that listing on the National Register does not prohibit "any actions which may otherwise be taken by the property owner with respect to the property." However, as that same provision provides, there are various consequences to listing on the National Register. For example, the very purpose of the National Register is to provide "an authoritative guide to be used by Federal, State, and local governments, private groups and citizens to identify the Nation's cultural resources and *to indicate what properties should be considered for protection from destruction or impairment*." 36 C.F.R. § 60.2 (emphasis added). In this sense, the National Register is "a planning tool" that commands federal oversight when federal agencies undertake a project that affects a listed or eligible property. *Id.* § 60.2(a). Specifically, the federal agency must provide the Advisory Council on Historic Preservation a reasonable opportunity to comment on the proposed action; however, after the comment period, the federal agency "may adopt any course of action it believes appropriate." *Id.*

Further, under this same regulation, owners of listed properties are encouraged to preserve and rehabilitate depreciable historic structures by receiving certain tax incentives and favorable tax treatments. *Id.* § 60.2(c). Conversely, the regulation "discourage[s] destruction of historic buildings by eliminating certain otherwise available Federal tax provisions both for demolition of historic structures and for new construction on the site of demolished historic buildings." *Id.* Stated another way, owners of listed property are discouraged from destroying historic buildings because, if they do destroy an historic structure, certain favorable tax

incentives are no longer available to them. Lastly, the regulation provides that, "If a property contains surface coal resources and is listed in the National Register, certain provisions of the Surface Mining and Control Act of 1977 require consideration of a property's historic values in the determination on issuance of a surface coal mining permit." *Id.* § 60.2(d).

Thus, while the regulations may not strictly prohibit a property owner from taking certain actions with respect to his or her property, they do impose consequences on those property owners that take such action. Should the property owner wish to destroy an historic structure on his or her listed property, the property owner is stripped of certain tax incentives. Should the property owner desire a surface coal mining permit, he or she must allow the federal government to first consider the property's historic values and thereby risk being denied a permit. Stated another way, the regulations impose a certain level of government oversight and interference that does not affect unlisted properties. Accordingly, while Defendants argue that property owners are not prohibited from taking any actions with respect to their listed property, a more thorough reading of this regulation makes clear that a property's listing on the National Register results in real consequences to the property's owner—consequences that could affect the ability to freely use and enjoy the property.[17]

Further, the Court is mindful of the purpose underlying the injury-in-fact requirement. This requirement "is designed to ensure that the litigant has a concrete and particularized interest

---

[17] On this point, Defendants have cited to *Moody Hill Farms Ltd. P'ship v. U.S. Dep't of Interior*, 205 F.3d 554, 556 (2d Cir. 1999) for support; however, this case does not address standing. Rather, that court rejected a due process argument "because national listing on its own does not impose any burdens on plaintiffs' use of their property," and they had therefore failed to demonstrate that a state action deprived them of a protected property interest. *Id.* at 561–62. By contrast, this Court considers whether Plaintiffs have *standing*—i.e., whether they have an "injury in fact," or "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 560. Defendants have not cited to any authority that the "invasion" of the legally protected interest must constitute a deprivation sufficient to trigger due process concerns. Further, to the extent the *Moody Hill* analysis could be read to say that listing on the National Register has absolutely no effect on a property owner's legally protected interests, this Court disagrees for the reasons already stated.

distinct from the interest held by the public at large." *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001) (citing *Lujan*, 504 U.S. at 562–63; *Seirra Club v. Morton*, 405 U.S. 727, 735 (1972)). But the fact that a "litigant's interest must be greater than that of the public at large does not imply that the interest must be a substantive right sounding in property or contract." *Id.* In the present case, the plaintiffs own the affected property, and they have therefore demonstrated an interest greater than that of the general public. The Court therefore finds that they have a concrete and particularized interest sufficient to satisfy constitutional standing requirements.

In reaching this conclusion, the Court notes that many of the cases analyzing this injury-in-fact requirement concern associational or third-party standing—i.e, cases in which preservation organizations, not property owners, attempted to challenge agency action related to a listed property. *See, e.g.*, *Lujan*, 504 U.S. at 560; *Sierra Club v. Salazar*, 894 F. Supp. 2d 97 (D.D.C. 2012) (finding preservation organizations lacked standing), *rev'd by Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014) (finding that preservation organizations demonstrated standing). Here, however, the plaintiffs are the very property owners who actively participated in the administrative proceeding by submitting objections and seeking delisting of the property. In that sense, they are directly and adversely affected by the Keeper's actions, and they have certainly been sufficiently engaged in the administrative process. Simply stated, their stake in the outcome of this litigation is personal. This distinguishes the present matter from those cases in which non-property owners were found to lack standing. *See, e.g.*, *South Hill Neighborhood Ass'n v. Romney*, 421 F.2d 454, 461 (6th Cir. 1969) (holding that third-party preservation-oriented nonprofit corporations lacked standing because they did not own or have legal title or

control over the affected buildings and they therefore lacked a sufficient interest in the

litigation).

This distinction is an important one. As the Supreme Court explained in *Lujan v.*

*Defenders of Wildlife*,

> When the suit is one challenging the legality of government action or inaction, the
> nature and extent of facts that must be averred (at the summary judgment stage) or
> proved (at the trial stage) in order to establish standing depends considerably upon
> whether the plaintiff is himself an object of the action (or forgone action) at issue.
> *If he is, there is ordinarily little question that the action or inaction has caused him*
> *injury, and that a judgment preventing or requiring the action will redress it.* When,
> however, as in this case, a plaintiff's asserted injury arises from the government's
> allegedly unlawful regulation (or lack of regulation) of *someone else,* much more
> is needed.

504 U.S. at 561–62 (first emphasis added). Accordingly, "when the plaintiff is not himself the

object of the government action or inaction he challenges, standing is not precluded, but it is

ordinarily 'substantially more difficult' to establish." *Id.* at 562 (citations omitted). Conversely,

when a plaintiff *is* the object of the challenged agency action, it is easier to establish the requisite

standing.

In the present case, the plaintiffs challenging the Keeper's decision are the same property

owners who petitioned the Keeper to remove the property from the National Register. In other

words, they were the "object[s] of the action" at issue in this case. *Id.* at 561. Under such

circumstances, there is "little question that the action . . . has caused [the plaintiffs] injury, and

that a judgment preventing or requiring the action will redress it." *Id.* at 561–62. More

specifically, in this case, there is little question that the Keeper's denial of the delisting petition

has caused the injury discussed above—namely, the listing of the Upper Reaches on the National

Register and the resulting invasion of the property owners' rights to use and enjoy their property.

They therefore have a "sufficient personal stake in the outcome of the controversy," thereby assuring concrete adverseness. *Baker*, 369 U.S. at 205.

Of course, this injury must not only be concrete and particularized, it must also be actual or imminent. However, when the plaintiff asserts a violation of a procedural right that affects a concrete interest, the plaintiff does not have to meet "all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Cantrell*, 241 F.3d at 682 (finding that birdwatchers living adjacent to construction cite of a federally licensed dam satisfied injury-in-fact requirements where they sought to enforce a procedural right to protect their concrete interest in observing birds in their habitat). In the present case, the plaintiffs allege certain procedural injuries—i.e., that the procedure used to calculate owners and objectors is constitutionally defunct and fails to provide due process. They further allege that this procedural injury affects their concrete interest in the free use and enjoyment of their property, as discussed above. *See Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1549 (2016) (explaining that a procedural violation must be accompanied by a concrete harm to satisfy Article III standing); *Summers v. Earth Island Institute*, 555 U.S. 488, 497 (2009) (same). Accordingly, the plaintiffs need not meet the typical standard for immediacy.

Furthermore, the Court finds that Defendants' argument, if accepted as true, would lead to an absurd result. Defendants argue that these plaintiffs—the property owners who opposed the listing of their property and filed the removal petition—cannot demonstrate an injury-in-fact because listing on the National Register imposes no restrictions on the use of a listed property. But, as noted above, the listing of the property does affect the use of the property. For example, the property owners are deprived of certain otherwise available tax incentives if they choose to take certain action on their land (e.g., destroy an historic structure). Further, in other cases, even

- 34 -

third-party preservation organizations—not property owners—have been found to have standing
to challenge a property's status on the National Register. *See Jewell*, 764 F.3d at 5–7 (finding
that preservation organization's members would suffer injury if they were no longer able to view
and enjoy the property's aesthetic features). If such non-property-owners can satisfy the injury-
in-fact requirements of Article III, then surely the property owners themselves can demonstrate
standing. More importantly, Defendants' assertion, if true, would mean that a property owner
could rarely, if ever, challenge the listing of his or her property on the National Register (or a
denial of a petition to delist) because the owner could never demonstrate that his or her use of the
property was restricted by the listing. Under this theory, the APA's mandate of judicial review
would be rendered meaningless.

In response to this argument, Defendants assert, "If a plaintiff could satisfy the elements
to demonstrate Article III standing with respect to the Keeper's denial of a delisting petition, then
such a plaintiff could bring a lawsuit challenging a decision." [R. 56, p. 36] However,
Defendants do not explain how a plaintiff could ever demonstrate an injury-in-fact under their
theory. Further, Defendants argue that review under the APA would not be rendered meaningless
if this Court holds that Plaintiffs lack standing because "[a]n alleged failure to follow these
regulations would remain reviewable through litigation in the proper forum." *Id.* at 37.
Defendants do not explain what "proper forum" they are referencing or what other avenues of
relief might be available to Plaintiffs. In fact, it seems that if Plaintiffs cannot seek review under
the APA, they have no other recourse to challenge the Keeper's decision. *See San Carlos Apache
Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005) (concluding that the NHPA "does
not give rise to a 'private' right of action against the federal government. An aggrieved party
may pursue its remedy under the APA"); 5 U.S.C. § 704 ("Agency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); [R. 19, p. 7 ("If the owners of the property directly affected by the decision to list or delist the property in the National Register do not have standing, it would be hard to imagine that anyone would have standing to oppose a decision by the Keeper, thus rendering the procedural mechanisms to object meaningless.")].[18]

Accordingly, the Court finds that Plaintiffs have demonstrated an injury-in-fact sufficient to satisfy the constitutional standing requirement, and they are entitled to judicial review of the Keeper's decision. *See generally In re Smith & Wesson*, 757 F.2d 431, 433 (1st Cir. 1985) ("It is well-settled that there is standing to seek judicial review of agency action in the district courts under [the APA] when arbitrary or capricious agency conduct is claimed." (citing *Chrysler Corp. v. Brown*, 441 U.S. 281 (1978))); *National Ass'n of Psychiatric Treatment Centers for Children v. Weinberger*, 658 F. Supp. 48, 51 (D. Col. 1987) (discussing "presumption favoring judicial review of administrative action" and explaining that "[r]eview of agency action initiated by aggrieved persons 'will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986))).

Defendants do not challenge the causation or redressability elements of constitutional standing. The Court nevertheless finds that these elements are satisfied. With respect to causation, the injury is clearly traceable to the challenged agency decision. *See Lujan*, 504 U.S. at 560 ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and

---

[18] The Court acknowledges that at least one court in this circuit has concluded that a private right of action exists under certain provisions of the NHPA not relevant here. *See Brewery Dist. Soc. v. Federal Highway Admin.*, 996 F. Supp. 750, 756 (S.D. Ohio 1998).

not . . . th[e] result [of] the independent action of some third party not before the court.'"

(quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976))).

Further, the injury complained of can be redressed by a favorable decision. *Id.* at 561 (quoting

citing *Simon*, 426 U.S. at 38). For example, the Court could, in theory, order the Secretary of the

Interior to revise the regulations and remand to the Keeper for further consideration. *Id.* at 568–

69 (explaining that the Court could order the Secretary of the Interior to revise his regulations,

but that it would not remedy the alleged injury in that case because the relevant agencies, which

were not party to the case, might not be bound by said regulations).

The Court therefore finds that Plaintiffs have satisfied Article III's standing requirements.

### 2.   Prudential Standing Under the APA

As noted above, the APA provides that "[a] person suffering legal wrong because of

agency action, or adversely affected or aggrieved by agency action within the meaning of a

relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. This prudential standing

requirement concerns "the question whether the interest sought to be protected by the

complainant is arguably within the zone of interests to be protected or regulated by the statute or

constitutional guarantee in question." *Assoc. of Data Processing Serv. Organizations, Inc. v.

Camp*, 397 U.S. 150, 153 (1970). "[S]uit is foreclosed only when the party's interests are so

marginally related to or inconsistent with the purposes implicit in the statute that it cannot

reasonably be assumed that Congress intended to permit the suit." 2 Am. Jur. Admin. Law § 407

(citations omitted). In fact, "[w]here statutes are concerned, the trend is toward enlargement of

the class of people who may protest administrative action." *Data Processing*, 397 U.S. at 154.

Neither party addresses this prudential standing requirement. Nevertheless, it is clear to

the Court that Plaintiffs' interest as owners of nominated and listed property is within the zone of

interests sought to be protected by the NHPA and its regulations.  The regulatory scheme of the NHPA and the procedural requirements for nominating and listing properties are intended to protect those persons who would be directly affected by a property's listing in the National Register—the property owners. "If the [property owners] do not have standing [to challenge errors within the nomination and listing process], it is hard to image that anyone would have standing to oppose [the nomination and listing process]." *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 176 (3d Cir. 2000). The Court therefore finds that Plaintiffs—the objecting property owners adversely affected by the Keeper's decision—have satisfied the prudential standing requirement.

### B.  Statute of Limitations

The APA does not provide a specific limitations period. *See Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) (citation omitted). "Numerous courts have held, however, that a complaint under the APA for review of an agency action is a 'civil action' within the meaning of section [28 U.S.C. § 2401(a)]." *Id.* (citation omitted). Section 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Thus, a complaint for judicial review under the APA has a six-year statute of limitations. *Slater*, 120 F.3d at 631 (citations omitted).

### 1.  Plaintiffs' Challenge to the Keeper's Decision

The six-year statute of limitations typically begins to run at the time the right of action accrues under the APA, which is at the time of "final agency action." *See id.* (quoting 5 U.S.C. § 704). To determine whether an agency's action is "final" under the APA, "[t]he core question is whether the agency has completed its decision making process, and whether the result of that

process is one that will directly affect the parties." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)). To satisfy the first condition, "the challenged action must mark the consummation of the agency's decisionmaking process," meaning the action ""must not be of a merely tentative or interlocutory nature,' such that judicial review of the action would 'disrupt the orderly process of adjudication.'" *Berry v. United States Dept. of Labor*, 832 F.3d 627, 633 (6th Cir. 2016) (citations omitted). To satisfy the second condition, "the challenged action must determine rights and obligations of a party or cause legal consequences," meaning "it must have a 'sufficiently direct and immediate' impact on the aggrieved party and a 'direct effect on [its] day-to-day business.'" *Id.* (citations omitted).

In their Cross-Motion for Summary Judgment, Defendants argue that the Keeper's 2009 listing decision is the "final agency action" in this case, and Plaintiffs' claims are therefore time-barred to the extent they seek to challenge that listing decision. [R. 51-1, pp. 29–30] Defendants made this same argument in their Motion to Dismiss, [R. 12]. The Court denied the Motion to Dismiss on that ground, holding that Defendants' characterization of Plaintiffs' claims "fails simply by looking at the complaint." [R. 19, p. 5–6] The Court explained,

> The complaint plainly states that the plaintiffs suffered a legal wrong and were adversely affected by the actions of the defendants "in denying the petition for delisting of the Property." [Record No. 1, ¶ 40] The petition for delisting of the property was submitted to the Keeper through the Kentucky State Historical Preservation Office and was received by the Keeper on January 27, 2017. [Record No. 1-20] The Keeper subsequently denied the petition to remove the Property from the National Register on March 13, 2017. *Id.* The plaintiffs are seeking review of the decision by the Keeper to deny the petition to remove the Property. As a result, the action is not time-barred.

*Id.* at 6.

In that prior order, the Court reviewed Defendants' timeliness arguments under Rule 12, whereas the Court must now consider this argument at the summary judgment stage. However,

Defendants have not pointed to any evidence of record indicating Plaintiffs' intent to challenge the 2009 listing decision. Instead, Defendants argue, "Now that the full record is before the Court, it is clear that Plaintiffs challenge a 2009 listing decision that occurred over ten years ago, well outside the period of time by which Plaintiff was required to bring a claim," but for support, they cite only to the *complaint*. [R. 51-1, p. 30 (citing R. 1 ¶¶ 19, 25)] As the Court previously ruled, the complaint makes clear that the plaintiffs allege they "suffered a legal wrong and were adversely affected by the actions of the defendants 'in denying the petition for delisting of the Property.'" [R. 19, p. 5 (citing R. 1 ¶ 40)]

In fact, Plaintiffs' response makes clear that they are only challenging the March 13, 2017 denial of the removal petition. Plaintiffs explain that their petition to delist "was based on errors in the owner/objector counting process surrounding the 2009 nomination," but they are not seeking judicial review of the 2009 listing decision; rather, the final agency action at issue in this suit is the 2017 denial of the petition to delist. [R. 54, pp. 5–6]

In response, Defendants argue that "Plaintiffs cannot resurrect a time-barred claim by submitting a petition to the Keeper after the statute of limitations has run based on facts known and knowable to Plaintiffs at the time the [property] was listed." [R. 56, p. 8] Stated another way, Defendants continue to argue that the 2009 listing decision is the final agency action at issue in this case, and that the 2017 denial of the removal petition does not create a new final agency action for which Plaintiffs can seek judicial review. The Court finds this argument unavailing.

First, the Court questions how a party could seek judicial review of a decision to list a property on the National Register without first filing a petition to delist. In fact, the regulations expressly provide that "[n]o person shall be considered to have exhausted administrative remedies with respect to removal of a property from the National Register until the Keeper has

denied a petition for removal pursuant to this section." 36 C.F.R. § 60.15(l); *see also White v. Shull*, 520 F. Supp. 11, 14 (S.D.N.Y. 1981) (holding that the plaintiff was required to exhaust his administrative remedies by filing a petition to delist). The Kentucky Court of Appeals voiced the same concern in response to the state court defendants' exhaustion arguments. *Norton*, 2013 WL 310159, at *10 ("[W]e must agree with the Appellees that *if* the Appellants were seeking to have a court of this Commonwealth request the removal of the property from the National Register, then clearly 36 C.F.R. § 60.15 precludes such action until the Keeper has denied the petition for removal."). Then, in the present case, the defendants suggest in their response brief that a property owner must file a petition to delist before seeking judicial review of the Keeper's listing decision. [R. 51-1, n.19 (arguing that Plaintiffs cannot argue that the property is ineligible for listing without first exhausting their administrative remedies on that issue)] Defendants' present argument that the 2009 listing decision is the final agency action triggering the APA's statute of limitations therefore appears to be, at best, disingenuous.

Further, courts have held that an agency's reopening or reconsideration of its prior final decision to be a "final agency action" under the APA when the agency addresses new evidence or changed circumstances. *See Berry*, 832 F.3d at 633–34 (finding that an agency's refusal to reopen a claim for workers' compensation benefits based on new evidence was a final agency action); *Sendra Corp. v. Magaw*, 111 F.3d 162, 166 (D.C. Cir. 1997) ("[I[f an agency denies a petition for reconsideration alleging 'new evidence' or 'changed circumstances,' the agency's denial is reviewable as a final agency action." (quoting *Interstate Commerce Comm'n v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 278 (1987))).

Of course, the present matter is distinguishable from these cited cases because there exists a regulation expressly requiring the property owners to file a petition to delist prior to

seeking judicial review. *See* 36 C.F.R. 60.15(l). Nevertheless, the present matter presents an analogous situation. The Keeper listed the property on the National Register in 2009, after which the property owners continued to participate in the state court litigation. The Kentucky Court of Appeals thereafter issued its decision remanding the matter to the Fayette Circuit Court, which in September 2016 granted summary judgment in favor of the property owners and cited due process concerns. *See* NP pp. 2173–79. Soon after, the property owners filed the petition to delist—essentially, a petition asking the Keeper to reconsider the prior listing decision—citing new circumstances, namely, the Kentucky Court of Appeals' due process analysis. The Keeper issued a substantive response on March 13, 2017 after reviewing the administrative record.  In the denial letter, the Keeper addressed the merits of the petition, including the post-listing state court litigation. The Keeper therefore reconsidered its prior listing decision and considered new evidence and changed circumstances—the post-listing state court litigation. Its denial of the petition to delist marked the end of the Keeper's process for deciding whether to delist the property. It was not informal or tentative; it definitively denied the removal petition and provided no further opportunity for administrative review. Further, the denial of the petition to delist had a direct and immediate impact on the property owners, who could no longer seek administrative review of their property's listing. Accordingly, even in the absence of the regulation requiring Plaintiffs to file a petition to delist, the Keeper's March 13, 2017 decision was the consummation of the agency's decision-making process, and it directly affected the plaintiffs. *See Slater*, 120 F.3d at 631 (quoting *Franklin*, 505 U.S. at 797).

In sum, the Court finds that the applicable final agency action in this case is the Keeper's denial of the removal petition, which took place on March 13, 2017. Plaintiffs' cause of action seeking judicial review of that decision therefore accrued on March 13, 2017, and they then had

- 42 -

six years to bring suit under the APA. As a result, the present challenge to that decision is not

time-barred. *See infra* Section III(C)(1) (discussing merits of Plaintiffs' APA claims).

### 2. Plaintiffs' Challenge to the Regulations

Defendants next argue that "Plaintiffs cannot assert an untimely facial challenge to the

NPS's regulations governing the nomination process, which were promulgated in the early

1980s. Any challenge to those regulations were required to be brought by October 12, 1989," six

years after the regulations were published. [R. 51-1, p. 30] Defendants further argue that, even if

the plaintiffs are not presenting a facial challenge to the regulations and are instead challenging

the application of the regulations in this specific administrative proceeding, that cause of action

accrued in 2009, at the time of listing. [R. 56, pp. 4–6]

The distinction between a facial challenge to the regulations and an "as-applied"

challenge is an important one. A facial challenge "considers [the regulation's] application to all

conceivable parties." *State v. National Indian Gaming Commission*, 151 F. Supp. 3d 1199, 1218

(D. Kan. 2015) (quoting *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014)) (internal

quotation marks omitted). A plaintiff asserting a facial challenge to regulations must do so within

six years of the regulation's publication in the Federal Register. *Id.* (citing *Wind River Mining

Corp. v. United States*, 946 F.2d 710, 714–15 (9th Cir. 1991)). "An as-applied challenge is not

subject to the same limitation." *Id.* at 1219. Instead, a plaintiff seeking to make an as-applied

challenge—i.e., a challenge to an agency's application of regulations to the plaintiff's specific

circumstances—must do so within six years of the adverse agency decision. *Id.* (citing *Wind

River Mining*, 946 F.2d at 716).

However, "courts have held that the . . . six-year statute of limitations does not bar a

challenge of an agency's action when the affected party claims that the agency exceeded its

statutory authority." *Blanco v. United States*, 433 F. Supp. 2d 190, 197 (D.P.R. 2006) (citing

*Wind River Mining*, 946 F.2d at 714–15). In other words, if "a challenger contests the substance

of an agency decision as exceeding constitutional or statutory authority, the challenger may do

so" even after the six-year limitations period for challenging the regulations has expired. *Wind

River Mining*, 946 F.2d at 715. To do so, the challenger must file "a complaint for review of the

adverse application of the decision to the particular challenger." *Id.* Stated another way, if a party

seeks to present a facial challenge to the regulations, he must typically do so within six-years of

their promulgation; however, if his specific challenge to the regulations is that the agency

exceeded its statutory or constitutional authority in promulgating said regulations, he can assert

that claim within six years of the agency's application of those allegedly-defective regulations to

him. *See Blanco*, 433 F. Supp. 2d at 197. Under those circumstances, "an agency's application of

a rule to a party creates a new, six-year cause of action to challenge [] the agency's constitutional

or statutory authority." *Id.* (quoting *Dunn-McCampbell Royalty Interest, Inc. v. National Park

Service*, 112 F.3d 1283, 1287 (5th Cir. 1997)) (internal quotation marks omitted).

     In the present case, the plaintiffs challenge the Keeper's 2017 denial of their removal

petition, arguing that the Keeper's reliance on the regulations is improper because those

regulations exceed the agency's statutory authority. Thus, the plaintiffs assert a facial challenge

to the regulations and would typically be required to bring such a claim within six years of the

regulations' promulgation. However, because they argue that the regulations exceed the agency's

statutory authority, they can bring such claims more than six years after the regulations'

promulgation "by filing a complaint for review of the adverse application of the" regulations to

these plaintiffs. *See Wind River*, 946 F.2d at 715. The plaintiffs have done exactly that by

seeking review of the adverse application of the regulations in the Keeper's denial of their

removal petition.  As noted above, the Keeper's denial of the removal petition occurred in March

2017, and the six-year statute of limitations therefore began to run on that date. Plaintiffs'

substantive challenge to the regulations as exceeding the agency's statutory authority is therefore

timely. *See infra* Section III(C)(2) (discussing merits of Plaintiffs' statutory authority claims).

### 3.  Plaintiffs' Due Process Claims

Under the APA, the reviewing court must set aside agency action that it finds to be

"contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Thus, as

this Court has previously explained, "[c]laims that an agency violated constitutional rights are

reviewed pursuant to the APA." *Norton v. Beasley*, No. 17-351, 2018 WL 2127297, at *3 (E.D.

Ky. May 15, 2019) (denying request for discovery on Plaintiffs' constitutional claim because

such claims are governed by the APA and limited to the administrative record (citations

omitted)); *see also Musa v. Nielsen*, No. 18-12073, 2020 WL 4587406, at * 2 (E.D. Mich. Feb.

11, 2020 (same). The six-year statute of limitations applies to these constitutional claims. *See*

*Worthington v. Office of National Drug Control Policy*, No. 19-0081, 2020 WL 1509167, *6

(D.D.C. Mar. 30, 2020) (applying six-year statute of limitations to the plaintiff's APA and

constitutional claims) (citations omitted).

In the present case, Plaintiffs allege violations of their procedural and substantive due

process rights. [R. 47, pp. 34–36] However, Plaintiffs' arguments on this issue are wholly

undeveloped.[19] First, Plaintiffs make no effort to distinguish between substantive due process

---

[19] To the extent that Plaintiffs attempt to argue that the agency violated its constitutional authority in promulgating these regulations, the Court finds that this argument is also wholly undeveloped. Though such a claim may have been timely, *see supra* Section III(B)(2), Plaintiffs have not framed their constitutional argument in this way. Instead, Plaintiffs argue that the regulations are violative of due process—an argument that is also wholly undeveloped, as noted above. The Court is not obligated to develop the Plaintiffs' half-hearted arguments. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quoting

and procedural due process. In fact, Plaintiffs arguments focus almost entirely on whether they have a protected property interest that would trigger a requirement of *procedural* due process. [R. 47, pp. 34–36; R. 54, pp. 24–27] As to whether they were afforded due process—either procedurally or substantively—Plaintiffs rely almost exclusively on the Kentucky Court of Appeals' 2013 opinion.[20]

In that opinion, the Kentucky Court of Appeals stated its belief that the state court defendants "did not misapply the administration of the regulations." *Norton*, 2013 WL 310159, at *16. However, the court believed that the regulations were "inadequate by their failure to address the counting of votes concerning trusts, estates, LPs, and LLCs and the fixing of a definite time for designation of the number of parcels of land and the landowners entitled to participate." *Id.* Thus, the court found that the process used "to assess the number of property owners and the corresponding number of objections is fundamentally flawed" and was "arbitrary and unclear." *Id.* at *15. The Kentucky Court of Appeals did not explain whether it believed that the regulations violated procedural or substantive due process requirements, or both, or whether its analysis rested on the state or federal constitution, or both. But it clearly believed that the regulations were fundamentally flawed, while finding no error in the agencies' administration of the regulations with respect to these property owners.

---

*Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))).

[20] In Plaintiffs' Motion for Summary Judgment, Plaintiffs state that the fundamental requirement of due process is the opportunity to be heard at a meaningful time, in a meaningful manner. [R. 47, p. 36] Then, without explanation, they argue that "[t]his did not happen and the Kentucky Court of Appeals already said so. Plaintiffs' due process rights have been violated." *Id.* Then, in Plaintiffs' response/reply brief, they argue, "The prejudicial procedural errors are set out at length in the Court of Appeals' Opinion and above, and, in any event, are self-evident from the Defendants' adherence to a regulation that (contrary to statute) does not provide each owner of each individual property with the opportunity to object." [R. 54, p. 27] They provide no other explanation or citation to authority.

Plaintiffs seemingly adopt this analysis as their own, without adding any additional theories, arguments, or support. [R. 47, p. 36; R. 54, p. 27] In essence, then, Plaintiffs argue that the regulations are constitutionally infirm for the reasons stated by the Kentucky Court of Appeals—or in other words, the regulations are fundamentally flawed because they violate due process requirements. Thus, Plaintiffs are actually asserting a facial due process challenge—not an as-applied challenge—to the regulations. As explained above, such facial challenges must be brought within six years of the regulations' publication. *See National Indian Gaming Commission*, 151 F. Supp. 3d at 1218 (citing *Wind River Mining*, 946 F.2d at 714–15). This facial challenge is therefore untimely.[21]

Accordingly, the Court will grant Defendants' Cross-Motion for Summary Judgment as to Plaintiffs' due process claims.

### C.  Judicial Review Under the Administrative Procedure Act

#### 1.  Review of Agency Action Under the Arbitrary and Capricious Standard

As noted above, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A). The Supreme Court has explained that an agency's action is arbitrary and capricious when the agency:

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

---

[21] In their response brief, Plaintiffs respond to Defendants' statute of limitations arguments by invoking the doctrine of equitable tolling. [R. 54, pp. 8–10] However, Plaintiffs make this alternative argument only in the context of challenging the Keeper's original listing of the property. Plaintiffs state, "Even if the relevant 'final agency action' is deemed to be the Keeper's original listing of the Property, the limitations period has been equitably tolled." *Id.* at 8. Plaintiffs do not make any argument that the doctrine of equitable tolling should apply to their facial constitutional challenges. *See generally P&V Enterprises v. U.S. Army Corps of Engineers*, 466 F. Supp. 2d 134, 149–150 (D.D.C. 2006) (noting the plaintiffs' failure to "establish a basis on which the limitations period governing their facial challenge to [a statute] should be equitably tolled" and finding that claim was time-barred).

that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

When reviewing agency action under this standard, the reviewing court must not substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (explaining that the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))). Instead, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416).

However, despite this deferential standard of review, the court's review is not inconsequential. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). As the Sixth Circuit has explained, "The arbitrary-and-capricious standard . . . does not require us merely to rubber stamp the [agency's] decision." *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citation omitted). Stated another way, "'[d]eferential review is not no review,' and 'deference need not be abject.'" *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)). Thus, though this standard of review may be "a narrow one," the reviewing court's inquiry must "be searching and careful." *Marsh*, 490 U.S. at 378 (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416).

Nevertheless, "[e]ven when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may be reasonably discerned.'" *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas—Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)). However, it must be clear that the agency "engage[d] in reasoned decision making" and "examine[d] all relevant factors and record evidence." *Stewart v. Azar*, 313 F. Supp. 3d 237, 259 (D.D.C. 2018) (citations omitted). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)) (internal quotation marks omitted).  Additionally, the agency must respond meaningfully to objections raised by a party. *PPL Wallingford Engery LLC v. Federal Energy Regulatory Commission*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citations omitted).

In the present case, Plaintiffs argue that the Keeper's denial of the removal petition, and the process leading up to that decision, was arbitrary and capricious. [R. 47, pp. 24–30] Specifically, Plaintiffs argue that the Keeper simply deferred to the SHPO's calculations and therefore failed to engage in reasoned decision-making. *Id.* Plaintiffs further argue that the agency's actions were arbitrary and capricious because the Defendants failed to meaningfully respond to the property owners' objections. *Id.*

In response, Defendants argue that Plaintiffs' removal petition only alleged "prejudicial procedural error," and the petitioners did not allege that the property should be delisted based on the owner and objector count. [R. 51-1, p. 28] In other words, Defendants argue that the petitioners sought removal only on the basis of procedural error, so they are barred from now

challenging the owner and objector count. *Id.* Further, Defendants argue, the petitioners provided no specific facts or evidence to support their allegation of procedural error.

### a. Reviewability

As an initial matter, the Court addresses Defendants' reviewability argument. As the Court has already explained, the plaintiffs seek judicial review of the Keeper's denial of their removal petition. To the extent they challenge the Keeper's failure to conduct a meaningful review of their removal petition or to meaningfully respond to their objections, the Court agrees that Plaintiffs are limited to the concerns and objections raised in the removal petition—namely, delisting based on prejudicial procedural error. *Karst Envtl. Educ. & Protection Inc. v. Fed. Highway Admin.*, 559 F. App'x 421, 424 (6th Cir. 2014) (explaining that plaintiffs must present their claims during the administrative process "in sufficient detail to allow the agency to rectify the alleged violation" (quoting *Forest Guardians v. U.S. Forest Service*, 495 F.3d 1162, 1170 (10th Cir. 2007))).  In other words, they raised only "prejudicial procedural error" as a basis for delisting, and they cannot now argue that the Keeper should have delisted the property for other reasons (e.g., it did not meet the criteria for historical preservation).

However, Plaintiffs do not seek to argue to this Court new reasons why the property should be delisted. Rather, Plaintiffs argue that the Keeper failed to adequately review and respond to their petition to delist, *see infra* Section III(C)(1)(b), and the regulations relied upon by the Keeper conflict with the NHPA. *See infra* Section III(C)(2). The Court limits its review to these issues.

### b. Reasoned Decision-Making

Having concluded that these issues are properly before the Court, the Court now considers Plaintiffs' arguments that Defendants acted arbitrarily and capriciously. Specifically,

Plaintiffs argue that the Defendants "renounced any role in the determination of the number of owners and number of objectors, even after it became apparent that the SHPO was unable to apply the applicable regulations without guidance from the Defendants and even after the SHPO made its bias against the objectors clear." [R. 47, pp. 22–23] Stated another way, Plaintiffs argue that Defendants relied on the SHPO's certification that it had followed the proper process, without independently confirming the number of owners and objectors. *Id.* at 23. Further, Plaintiffs argue, the Keeper inadequately responded to the removal petition by simply reciting the regulations and adopting the SHPO's analysis. *Id.* As a result, Plaintiffs argue, Defendants failed to engage in reasoned decision-making. *Id.*

In *Sierra Club v. Salazar*,[22] a case relied upon by Plaintiffs, the United States District Court for the District of Columbia provided a thorough overview of the key features of "reasonable decision-making." 177 F. Supp. 3d at 531–34. That court explained, "To survive review under the arbitrary and capricious standard, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 531 (citation omitted). In other words, the agency must engage in reasoned decision making. *Id.* Whether an agency has engaged in reasoned decision making "depends on the specific facts of a particular case." *Id.* at 532 (citation omitted). This is because "arbitrary and capricious review defies generalized application and must be contextually tailored." *Id.* (citation omitted).

Though the inquiry is fact-specific, and "there is no formula for what constitutes reasoned decisionmaking," courts have identified four guiding principles: deliberation, transparency,

---

[22] The Court acknowledges that the *Salazar* court ultimately found that the Keeper had acted arbitrarily and capriciously in denying a petition to reconsider a delisting decision. However, the facts of that case are starkly different than the facts presented here.

rationality, and evidentiary propriety. *Id.* To satisfy the deliberation element, "the agency must 'engage the arguments raised before it.'" *Id.* (citation omitted). This means that the agency must consider the important aspects of the problem and any significant alternatives that may be available. *Id.* (citations omitted). If an agency fails to meaningfully respond to a party's objections, its decision is not truly deliberative. *Id.* (citation omitted).

With respect to the transparency element of reasoned decision making, "the agency 'must, of course, reveal the reasoning that underlies its conclusion.'" *Id.* (quoting *Transcon. Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 898 (D.C. Cir. 1995)). The agency must do more than just "insist[ ] that its conclusions are rational and supported by the record." *Id.* (quoting *San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n*, 789 F.2d 26, 48 (D.C.Cir.1986)) (internal quotation marks omitted). "Instead, it must give the court the rationale underlying the importance of factual distinctions as well as the factual distinctions themselves." *Id.* (quoting *San Luis Obispo Mothers for Peace*, 789 F.2d at 48) (internal quotation marks omitted). The agency's rationale and findings must be "understandable," meaning the agency's explanation cannot be "unclear or contradictory." *Id.* (quoting *Associated Gas Distribs. v. FERC*, 893 F.2d 349, 361 (D.C. Cir. 1989)) (internal quotation marks omitted).

The third element of reasoned decisionmaking—rationality—"pertains to the nature and substance of the agency's reasoning." *Id.* Simply stated, "the agency must base its decision on more than wishful or whimsical thinking." *Id.* An agency's reasoning fails to satisfy this rationality element if it is based on mere speculation or "mere conjecture and abstract theorizing offered in a vacuum," *Id.* (quoting *Kan. Gas & Elec. Co. v. FERC*, 758 F.2d 713, 721 (D.C. Cir. 1985) (internal quotation marks omitted). Further, an agency's reasoning is deficient if it conclusory or "so implausible that it could not be ascribed to a difference in view or the product

- 52 -

of agency expertise." *Id.* (quoting *United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 90 (D.C. Cir. 2010)) (internal quotation marks omitted).

Finally, with respect to the element of evidentiary propriety, the agency's factual findings must be supported by substantial evidence. *Id.* (citation omitted). The agency must examine all relevant data, and its explanation cannot run counter to the evidence before it. *Id.* (citations omitted).

In the present case, the Court finds that all four elements have been satisfied, and the Keeper's denial of the petition to delist was not arbitrary and capricious. In the petition to delist, the petitioners cited "prejudicial procedural error." They did not explain these alleged procedural errors in detail or list them out for the Keeper's consideration. Rather, they relied heavily upon the state court litigation, namely, the Kentucky Court of Appeals' decision. On this point, Defendants argue that the right to a meaningful review (including meaningful responses to objections) is incumbent on the petitioners' explanation of their objections. [R. 51-1, p. 21] The Court agrees.

Nevertheless, despite the lack of detail in the delisting petition, the Keeper responded in detail. *See supra* Section I(J). First, the Keeper addressed the agency's compliance with the regulations. NR pp. 1369–70. Rather than merely rubber-stamping the SHPO's calculation of owners and objectors, the Keeper explained why it believed that the SHPO's calculations were correct. The Keeper first noted that it had "conducted a detailed review of the record for the 2009 nomination and listing" of the property. *Id.* at 1369. This examination of the record revealed that "the SHPO identified property owners in accordance with the definition of 'owner' in 36 C.F.R. § 60.3(k)." *Id.* The Keeper further explained that the SHPO had utilized tax records to identify landowners within the prescribed time period and had timely notified those owners pursuant to

the regulations. *Id.* The Keeper also explained that the SHPO had received letters of objection

and support from property owners, and the SHPO had counted only those notarized objections

that met the requirements of 36 C.F.R. § 60.6(g). *Id.* at 1370. The Keeper acknowledged the

SHPO's final tally of 184 owners and 90 valid objections. *Id.* However, it explained that, after

the Keeper received the nomination and extended the comment period, it received additional

objections, notification of ownership changes, and rescissions of prior objections, bringing its

own calculation of owners and objectors to 182/90. *Id.* Thus, the Keeper clearly explained (1)

why it believed the SHPO had correctly calculated the number of owners and objectors pursuant

to the regulations and (2) how it ultimately calculated the final tally of owners and objectors.

Next, the Keeper addressed the post-listing state court litigation and the adequacy of the

regulations. *Id.* pp. 1370–72. With respect to this portion of the decision, the Court must disagree

with Plaintiffs' assertion that the Keeper improperly ignored the state courts' opinions. [R. 54,

pp. 21–24] Plaintiffs argue that "[t]he Keeper was obligated to undertake a meaningful review of

the procedural irregularities specifically found by the Kentucky Court of Appeals." *Id.* at 24. The

Keeper did just that, devoting approximately one and one-half pages of its denial letter to

addressing the state court litigation. NR pp. 1370–72. In that discussion, the Keeper addresses

the issues raised by the Kentucky Court of Appeals—whether the regulations provide a fixed

time for identifying owners; how individual owners and entity owners are counted; and how

many votes an individual owner or entity owner receives. The Keeper also addressed the process

for submitting nominations.

With respect to this first issue regarding the timeline for identifying owners, the Court

agrees that the regulation cited by the Keeper regarding the cut-off date for identifying owners is

not, at first glance, directly responsive to Plaintiffs concerns about the fluctuating number of

owners and objections. The Keeper cited 36 C.F.R. § 60(c), which provides that "[t]he list of owners shall be obtained from either official land recordation records or tax records, whichever is more appropriate, within 90 days prior to the notification of intent to nominate." At first glance, this citation seems irrelevant, as it addresses the identification of owners for *notification* purposes. However, the Keeper goes on to cite 36 C.F.R. § 60.6(g), which allows owners to object, even when they did not appear on the initial list of owners. Thus, as the Keeper explained in his letter, the regulations contemplate that the number of owners may change during the nomination process, and they accommodate such changes by allowing new owners to file objections. Perhaps the Keeper's explanation on this point could have been more thorough; however, the Court does not find that the provided explanation, without more, warrants a finding of arbitrary and capricious agency action. *See Salazar*, 177 F. Supp. 3d at 539 (finding that, under a reasonable interpretation of the regulations, "the regulations authorize the Keeper to recalculate lists of owners/objectors after receiving a nomination").

As for the other regulations addressed in this portion of the Keeper's decision, the Court finds the Keeper's explanations to be adequate. For example, the Keeper explains that the regulations "are clear with respect to how owners are counted." NR p. 1371. For support, the Keeper cites 36 C.F.R. § 60.3(k), which provides that "owner or owners" includes "those individuals, partnerships, corporations or public agencies holding fee simple title to property." This citation is important for two reasons: First, as the Keeper explained, this provision clarifies that an owner cannot include someone holding *less than* fee simple title, such as a life estate or lease holder. *Id.* at 1371. *See generally Salazar*, 177 F. Supp.3d at 536 (describing Keeper's conclusion that life estate holder's objection did not count as a straightforward reading of § 60.3(k), "which provides that '[t]he term owner . . . means . . . individuals . . . holding <u>fee</u>

simple title to property.'" (quoting 36 C.F.R. § 603(k) (emphasis added))).  Further, the regulation clarifies that individual owners and corporate owners are treated the same.

The Keeper goes on to explain why these owners are entitled to one vote, regardless of whether they are natural persons or corporate entities, and regardless of whether they own more than one parcel of land. NR p. 1371. The Keeper cited § 60.6(g), which provides that "[e]ach owner of private property in a district has one vote regardless of how many properties or what part of one property that party owns and regardless of whether the property contributes to the significance of the district." As the Keeper had just explained, an owner includes an individual as well as entities (like an LLC), and the regulation clearly states that each owner has one vote, even if that owner owns multiple parcels of affected land.

On this point, the Kentucky Court of Appeals' stated that the state court defendants had erred by "fail[ing] to provide any citation to any regulations that enumerate that trusts, estates, LLCs, and LPs are only entitled to a single vote while, in contrast, a husband and wife each have a vote regardless of how the title is held." *Norton*, 2013 WL 310159 at *16. While the Kentucky Court of Appeals made this comment in the context of a due process argument that has been held untimely in this case, the Court feels compelled to address it. As the Keeper explained, the regulations clearly state that an owner receives a single vote "*regardless of how many properties or what part of one property that party owns*." 36 C.F.R. § 60.6(g) (emphasis added). Thus, an owner receives a single vote, even if they own multiple properties and even if they share ownership of a single property with another fee-simple owner. And the regulations also clearly define owner as including "individuals, partnerships, corporations or public agencies." *Id.* § 60.3(k). Thus, each individual who owns a parcel (or parcels) of land in fee simple is entitled to a single vote, and each entity that owns a parcel (or parcels) of land is entitled to a single vote.

- 56 -

If a husband and wife own a parcel (or parcels) of land together, both *individual owners* are entitled to one vote each. If an LLC owns a parcel (or parcels) of land, that *corporate owner* is entitled to one vote. This explanation is clear not only in the Keeper's March 13, 2017 letter, but in the plain language of the regulations.

Lastly, the Keeper addresses the process for submitting objections. *Id.* at 1371–72. The Keeper cites 36 C.F.R. § 60.6(g), which clearly provides that an objecting property owner "shall submit to the [SHPO] a notarized statement certifying that the party is the sole or partial owner of the private property, as appropriate, and objects to the listing." Having reviewed these various regulations and the nomination, the Keeper concluded that "the SHPO's efforts to identify, notify, and inform owners meets the spirit and letter" of the regulations, and the regulations provide due process. *Id.* at 1372.

It is clear from the Keeper's written decision that the Keeper engaged in the arguments presented to it, namely, the procedural concerns (even though those arguments were not presented in detail). The Keeper's decision therefore satisfies the "deliberation" element noted above. Further, the decision reveals the Keeper's reasoning in a way that is clear and understandable, thereby satisfying the "transparency" element. This is true even though there may be some portions of the decision that the Court believes could be more thoroughly explained. *Alaska Dep't of Env't Conservation*, 540 U.S. at 497 ("Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may be reasonably discerned.'" (quoting *Bowman Transp., Inc.*, 419 U.S. at 286)). Additionally, the decision is not conclusory or implausible; it is based on a reasonable reading of the regulations. Further, it is based on the Keeper's review of the administrative record and is supported by substantial evidence. The final two elements of

reasoned decision making, "rationality" and "evidentiary propriety" are therefore satisfied. Thus, under the specific facts of this case, the Keeper engaged in reasoned decision making and adequately responded to the objections before it.

The Keeper's actions throughout the nomination process and prior to its March 13, 2017 letter also demonstrate that the Keeper engaged in reasoned decision making and did not merely "rubber-stamp" the SHPO's owner and objector calculations. On this point, it is important to first consider the duties of the SHPO and the Keeper. Under the NHPA, the SHPO is responsible for "identify[ing] and nominat[ing] eligible property to the National Register and otherwise administer[ing] applications for listing historic property on the National Register." 54 U.S.C. § 302303(b)(2). This is further reflected in the regulations, which govern the application process. Under the regulations, the SHPO is responsible for identifying owners, 36 C.F.R. § 60.6(c), providing notice to property owners, *id.* § 60.6(b), gathering objections, *id.* § 60.6(g), and determining whether a majority of owners object. *Id.* The SHPO's role in the nomination process makes sense given the requirement that owners be identified "from either official land recordation records or tax records," *id.* § 60.6(c), and the requirement that local authorities be consulted with during the nomination process. *Id.* § 60.6(b). In other words, the SHPO, as a local entity, is better situated to prepare a nomination and determine the accurate number of owners and objections. Even the plaintiffs acknowledge the SHPO's responsibility "for ascertaining whether a majority of owners have objected." [R. 54, p. 15]

Turning to the Keeper's responsibilities, the Plaintiffs argue that the Keeper must independently verify the owner-objector count, citing *Sierra Club v. Salazar*, 177 F. Supp. 3d 512 (D.D.C. 2016). In that case, the owner and objector count had fluctuated multiple times during the nomination and delisting process, depending on who crunched the numbers, resulting

in multiple owner-objector counts being submitted to the Keeper.  However, unlike in this case, the Keeper and the state agency in *Salazar* "were locked in a back-and-forth during which the Keeper wanted the State Agency to make an authoritative determination as to the count, but the State Agency disavowed any such responsibility. The Keeper then broke the deadlock by indiscriminately deferring to the State Agency's insufficiently supported conclusions." *Id.* at 538. Stated another way, the Keeper in *Salazar* asked the state agency to decide which of the various owner-objector counts was correct, and then simply rubber stamped the agency's calculation without additional review. The *Salazar* court found that the Keeper had not independently verified the accuracy of the state agency's owner and objection count. *Id.* at 538–39. The Keeper conceded that it had a duty to do so in that case, and the court noted that "[t]he Keeper's concession is consistent with the governing law." *Id.* at 538.

It is important to note, however, that "governing law" cited by the *Salazar* court does not impose a blanket requirement that the Keeper independently verify the owner-objector count in each and every nomination application (or delisting petition). *See, e.g.*, 36 C.F.R. § 60.6(r) ("Nominations will be included in the National Register within [forty-five] days of receipt by the Keeper or designee unless the Keeper disapproves a nomination."); *id.* § 60.6(t) ("Any person or organization which supports or opposes the nomination . . . may petition the Keeper during the nomination process either to accept or reject a nomination . . . . Such petitions received by the Keeper prior to the listing of a property . . . will be considered by the Keeper and the nomination will be substantively reviewed."); *id.* § 60.15(a)(4) ("Properties removed from the National Register for procedural error shall be reconsidered for listing by the Keeper after correction of the error or errors by . . . the Keeper, as appropriate.").[23] Rather, this Court understands *Salazar*

---

[23] For example, the *Salazar* court cites to *Moody Hill Farms Ltd. P'ship v. U.S. Dep't of Interior*, 205 F.3d 554 (2d Cir. 1999) as "holding that the Keeper has 'independent authority to determine whether properties are eligible for

to stand for the proposition that, under the specific and unique facts of that case, the Keeper had a duty to independently verify an owner-objector count given the state agency's inability to do so, and instead, that Keeper improperly rubber-stamped the state agency's unsupported calculations. In any event, for the reasons set forth below, the Court finds that the Keeper adequately reviewed and verified the SHPO's calculations.

This case presents a set of facts dramatically different than *Salazar*'s. First, the working relationship between the Keeper and the SHPO in this case differs starkly from the relationship between the state and federal agencies in *Salazar*. In the present case, the SHPO repeatedly sought guidance from the Keeper, and the Keeper provided such guidance based on its reasonable interpretation of the regulations. For example, on April 30, 2009, an employee of the SHPO office contacted the National Register by email, asking how it should count the objections of entities like limited partnerships, corporations, LLC, trusts, and estates. NR p. 438. An employee with the National Register replied with guidance, explaining that such entities "are treated as single owners, with one vote," even if an entity owns multiple plots of land. *Id.* at 438. However, "[i]f a husband and wife or any number of individuals are named on the deed or tax record as owners, they each get a vote for counting purposes." *Id.* As explained above, this explanation is supported by the plain language of the regulations. More importantly, perhaps, this email exchange demonstrates the National Register's willingness to provide direction to the SHPO when the SHPO needed it, rather than simply leaving that decision to the SHPO and "rubber-stamping" it later.

---

listing on the National Register and to name them to the National Register without the agreement' of state agencies." *Salazar*, 177 F. Supp. 3d at 538, n.21.  However, in *Moody Hill*, the Second Circuit considered whether a state agency's delisting of a property from the *state*'s registry had any effect on the Keeper's ability to list that same property on the *National* Register. 205 F.3d at 558. The Second Circuit held that the Keeper had the "independent authority" to list a property on the National Register, even if that property had been delisted from the state registry. *Id.* Notably, the Second Circuit references the Keeper's "independent authority" to do this and does *not* hold that the Keeper must *independently verify* the state agency's calculations.

This evidence further cuts against Plaintiffs' argument that "the Defendants renounced any role in the determination of the number of owners and number of objectors, even after it became apparent that the SHPO was unable to apply the applicable regulations without guidance from the Defendants and even after the SHPO made its bias against the objectors clear." [R. 47, pp. 22–23] When the SHPO asked for assistance in applying the regulations, the National Register did not renounce its role; rather, it did exactly what it was supposed to do—it provided guidance based on a reasonable interpretation of the regulations.  Further, the SHPO simply acted according to the guidance provided to it by the National Register; there is no evidence of bias, as Plaintiffs claim.[24] In fact, after the Kentucky Court of Appeals ruled in the state court plaintiffs' favor, the SHPO submitted the removal petition to the Keeper on behalf of those property owners, explaining that "[t]he state courts have spoken unequivocally, and delisting is appropriate in this circumstance." NR p. 1108. The SHPO further explained, "[W]e see no reason why the district should not be removed from the National Register of Historic Places." *Id.*

Further, unlike the state agency in *Salazar*, the SHPO in this case did not submit multiple owner-objector tallies or spreadsheets to the Keeper. Rather, the SHPO submitted a detailed spreadsheet and certified that it had complied with the regulations when identifying and notifying owners and calculating objections. *Id.* at 429–436, 845. Thus, unlike the Keeper in *Salazar*, the Keeper in this case had a reliable "official baseline" on which to rely. And while the

---

[24] As noted above, Plaintiffs allege that an SHPO employee, Mr. Perry, discouraged property owners from submitting objections. In fact, Mr. Perry testified that he recalled having a conversation with a property owner early in the nomination process. NR pp. 2079–80. The property owner asked about submitting an objection letter. *Id.* at 2079. At that point, Mr. Perry had only received one or two objection letters, and he "gave a prediction to" the caller that the nomination would receive a lot of support. *Id.* at 2079–80. Mr. Perry testified, "[S]o I communicated to him that if his—if he was trying to save himself time, then he probably wouldn't send in a letter of objection, but if he wanted to object, that we would receive it and would respect it." *Id.* at 2080. The Court does not find that this conversation demonstrates bias. And regardless, the record indicates that the property owner (identified by Plaintiffs as Harold Black) submitted an objection for his property, and his objection was included in the final count. *Id.* at 429.

Keeper may have reasonably relied on that official baseline, the Keeper did not merely "rubber stamp" the owner-objector count. In fact, the record demonstrates that the National Register was intimately familiar with the specific circumstances of this case, including post-nomination letters and objections that resulted in a final owner/objector count of 182/90. For example, in a November 27, 2009 letter, the Chief of the National Register provided a detailed explanation of the objection tally. *Id.* at 978–79. Based upon the above-listed evidence and a thorough review of the administrative record, the Court finds that the Keeper adequately reviewed and confirmed the SHPO's calculations.

Further, the Court notes that, even if it found that the Keeper had acted arbitrarily and capriciously for the reasons argued by Plaintiffs, the plaintiffs have not suffered any prejudice as a result of that arbitrary and capricious action. As noted above, the APA mandates that "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *see also Braniff Airways, Inc.*, 379 F.2d at 46 ("Reversal [of the agency's action] is not required by the fact that an agency made an 'error' if it is shown that the error was not 'prejudicial.'" (quoting *O'Kon*, 247 F. Supp. at 746)).

In this case, Plaintiffs presented several challenges to the Keeper's decision, but only two were found to be timely: the argument that the Keeper acted arbitrarily and capriciously by failing to meaningfully review and respond to their objections, and the argument that the regulations are inconsistent with the governing statutes. If the Court had ruled in Plaintiffs' favor on this latter argument, the regulations would be void and the owner and objector count would need to be recalculated. However, as explained below, Plaintiffs' statutory authority argument fails, and the regulations are not void ab initio as Plaintiff argued. If the Court had ruled in Plaintiffs' favor on the first argument—that the Keeper acted arbitrarily and capriciously—it

could have remanded the matter to the Keeper for a more thorough review of the Plaintiffs'

removal arguments. However, it is important to remember that the Court is *not* holding that the

regulations are void, and Plaintiffs have *not* argued that the regulations, if valid, have been

improperly applied in their case.[25] Stated another way, there is no argument that the agencies

improperly calculated the number of owners and objectors based on the regulations; rather,

Plaintiffs unsuccessfully attacked the regulations. Thus, even if the Keeper provided a more

thorough review and more detailed responses to the Plaintiffs' arguments, Plaintiffs have

presented no reason that the owner and objector count would change. Accordingly, even if this

Court were to vacate the Keeper's decision and remand for a more detailed review of the

removal petition and the alleged procedural errors, there is no reason to believe the owner and

objector count would change. Accordingly, under the prejudicial procedural error rule, the Court

would not remand to the agency for further consideration even if it determined that the agency

acted arbitrarily and capriciously.

## 2. Agency Interpretation of Governing Statutes

As noted above, the APA requires the reviewing court to consider whether an agency has

acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5

U.S.C. § 706(2)(C). In the present case, Plaintiffs argue that the regulations promulgated by the

Secretary of the Interior are inconsistent with the NHPA, and as a result, they cannot be relied on

---

[25] To the extent Plaintiffs argue that two alleged owners, a husband and wife named Wayne and Mary Quertermous, were denied their right to object, the Court notes that Plaintiffs have provided no evidence that Mr. and Mrs. Quertermous were fee simple property owners. The evidence of record indicates that Ms. Patsy Bratton owned six properties within the historic district, and she had agreed to pass her property on to Mr. and Mrs. Quertermous upon her death. *See* NR p. 451. Only Ms. Bratton was listed on the tax records, *id.*, and the regulations clearly state that ownership is determined "from either official land recordation records or tax records, whichever is more appropriate." 36 C.F.R. § 60.6(c). There is absolutely no evidence (e.g., a deed or tax record) that Mr. and Mrs. Quertermous held a fee simple interest in any of the properties at issue. Accordingly, the Court cannot find that these two individuals would add to the objection count if this matter were remanded to the Keeper for further consideration.

to justify the Keeper's decision. [R. 47, pp. 30–34] In essence, then, Plaintiffs argue that the agency exceeded its statutory authority in promulgating these regulations.

Generally, a reviewing court decides questions of law de novo. *Gonzale-De Leon v. Barr*, 932 F.3d 489, 492 (6th Cir. 2019). However, when the court reviews an agency's interpretation of an ambiguous statute or regulation, the reviewing court must abide by certain deference doctrines created by the Supreme Court. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (deferring to agency's reasonable interpretation of ambiguous governing statutes); *Auer v. Robbins*, 519 U.S. 452 (1997) (deferring to agency's reasonable interpretation of its own regulations). In the present case, the Court must consider whether the Secretary reasonably interpreted the governing statutes set forth in the NHPA. As a result, the Court applies the *Chevron* deference doctrine, as announced by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*

Under *Chevron*, the reviewing court must first consider "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. To ascertain the intent of Congress, the reviewing court "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (citations omitted). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

If the reviewing court concludes that "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute." *Id.* at 843 (citation omitted). Instead, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction

of the statute." *Id.* When considering whether the agency's regulations are based on a permissible construction of the governing statutes, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844 (citations omitted). Further, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843, n.11 (citations omitted).

If the agency's regulations are not based on a permissible construction of the statute, they are "a mere nullity" and are void ab initio. *Legal Environmental Assistance Foundation, Inc. v. United States Environmental Protection Agency*, 118 F.3d 1467, 1473 (11th Cir. 1997) (citing *Dixon v. United States*, 381 U.S. 68, 74 (1965); *United States v. Larionoff*, 431 U.S. 864, 873 (1977)). However, "[i]f the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute." *K Mart Corp.*, 486 U.S. at 291–92 (citation omitted).

### a. Regulation Allocating a Single Vote to an Owner Regardless of the Number of Properties Owned

Plaintiffs first argue that the regulation allocating a single vote to an owner regardless of the number of properties owned is inconsistent with the NHPA. [R. 47, p. 30] In their Motion for Summary Judgment, [R. 47], Plaintiffs do not identify the specific regulation to which they refer; however, in their response/reply brief, they cite to 36 C.F.R.§ 60.6(g). [R. 54, p. 19] This regulation provides, in pertinent part, "Each owner of private property in a district has one vote regardless of how many properties or what part of one property that party owns and regardless of whether the property contributes to the significance of the district." Plaintiffs argue that this regulation is inconsistent with 54 U.S.C. § 302105(a). That provision of the NHPA states,

The Secretary shall promulgate regulations requiring that before any property may be included on the National Register or designated as a National Historic Landmark, the owner of the property, or a majority of the owners of the individual properties within a district in the case of a historic district, shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property for inclusion or designation. The regulations shall include provisions to carry out this section in the case of multiple ownership of a single property.

Under *Chevron*, the Court must first determine whether this statute is ambiguous or silent on the precise issue raised by the plaintiffs: how many votes a property owner should receive in relation to the number of properties owned. Plaintiffs do not cite *Chevron* or directly address this first step. However, they do argue that "Congress plainly did not intend for an owner who owned multiple properties within a district to be given only one vote," pointing to the following language: ". . . the owner of the property, or a majority of the owners of the individual properties within the case of a historic district, . . . ." 54 U.S.C. § 302105(a). According to Plaintiffs, if Congress had intended that a property owner receive only one vote regardless of the number of properties owned, it would have omitted the phrase "of the individual properties." [R. 47, p. 30]

For support, Plaintiffs cite to a New York case in which the state court struck down a one-man, one-vote zoning rule, *Mead v. Fairbrother*, 506 N.Y.S.2d 514 (N.Y. Sup. Ct. 1968), and an unpublished Connecticut case in which the state court struck down a one-man, one-vote rule in the context of a historic district nomination, *Stepney, LLC v. Town of Monroe*, No. CV030407480S, 2008 WL 642642 (Conn. Super. Ct. 2008). Neither case involves the NPS regulations, the NHPA, or the APA. Nevertheless, citing these cases, Plaintiffs argue that Congress intended "to grant one vote to each owner of each parcel of property," as that reading

would be "consistent with American jurisprudence regarding the counting of 'votes' for purposes of real property issues."[26] [R. 47, p. 31]

The Court disagrees. First, the statute is not silent or ambiguous on this issue. When referring to objections, the statute makes no reference to the number of properties or parcels owned; instead, it refers to the number of *owners*. For example, the statute directs the promulgation of regulations that provide "the *owner* of the property, or a majority of the *owners* of the individual properties" "shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property for inclusion or designation." 54 U.S.C. § 302105(a) (emphasis added). Then, in subsection (b), the provision addressing "[w]hen property shall not be included on [t]he National Register or designated as [a] National Historic Landmark," the statute omits any reference to "individual properties." Instead, it provides, "If the *owner* of any privately owned property, or a majority of the *owners* of privately owned properties . . . object to inclusion or designation, the property shall not be included on the National Register or designated as a National Historic Landmark until the objection is withdrawn." *Id.* § 302105(b) (emphasis added). The Court therefore finds that the language of the statute is clear, and under that plain language, each owner is entitled to one vote, regardless of the number of properties owned.

---

[26] Plaintiffs also argue that "[t]he reasoning of these state Court decisions must apply here" because "[t]he regulation on which Defendants rely to count owners and objectors results in a result that is even more absurd than" in these cases. [R. 47, p. 32] To the extent that Plaintiffs cite these state law cases to argue that the regulations at issue lead to an absurd result and are therefore arbitrary and capricious or an abuse of discretion, the Court notes that Plaintiffs have not framed their argument in this way; rather, they have argued that the Secretary exceeded his statutory authority in promulgating the regulations. Because Plaintiffs frame their argument as one about statutory authority, the Court has found that it is timely. *See supra* Section III(B). A facial challenge to the regulations as arbitrary and capricious would be untimely. *See National Indian Gaming Commission*, 151 F. Supp. 3d at 1218 (citing *Wind River Mining*, 946 F.2d at 714–15). Further, as noted above, the cases cited by Plaintiffs involve state law and do not involve the NHPA or the APA.

On this point, the Court finds Plaintiffs' emphasis on the "individual properties" phrase in § 302105(a) to be misguided. Plaintiffs argue that Congress's single use of the phrase "individual properties" must mean that Congress intended each owner receive a vote for each piece of property owned. However, as noted above, § 302105(a) actually references the number of *owners*, and the phrase "individual properties" is not used at all in § 302105(b), which again references the number of *owners*. The Court therefore agrees with Defendants that the "more reasonable interpretation" of the phrase "individual properties" in subsection (a) is that Congress was merely acknowledging that there are often multiple "individual properties" within a nominated district, while nominations of historic buildings or individual sites usually involve only a single property. [R. 56, p. 13]

Further, even if the Court found that the statute was silent or ambiguous on this issue, it would find that the agency's interpretation is "based on a permissible construction of the statute."[27] *Chevron*, 467 U.S. at 843.  It is not unreasonable to interpret 54 U.S.C. § 302105 as directing that each *owner* be given a single vote, even if that owner owns multiple parcels of land. Had Congress intended a different outcome, it could have easily clarified that in the statute. That is, Congress could have clarified in § 302105(b), the provision related to objections, that each owner has an opportunity to concur or object as a function of or in proportion to the number of parcels owned. But instead, Congress did not tie the number of objections to the number of properties owned under § 302105(a) or (b) and instead referenced only "owner" or "owners." The Court assumes that Congress meant what it said and, by not addressing this specific issue, it intended the agency to fill that gap in the statutory language. *See Legal Environmental Assistance Foundation, Inc.*, 118 F.3d at 1473 (citations omitted).

---

[27] On this point, the plaintiffs again fail to cite *Chevron* and do not address this second step.

Alternatively, assuming that the statute is silent or ambiguous on this issue, the Secretary could have reasonably promulgated regulations allowing a property owner one vote per property owned. The NHPA provides discretion to the Secretary to promulgate regulations for, among other things "nominating properties for inclusion on, and removal from, the National Register and the recommendation of properties by certified local governments." 54 U.S.C. § 302103(2)(a). However, the Secretary did not promulgate a one-vote-per-each-parcel-of-property regulation, and instead chose to allow one vote per property *owner*, regardless of the number of properties owned. This regulation is consistent with the provisions cited above, which do not reference the number of parcels owned, but instead refer to the number of *owners*. *See id.* § 302105(a)–(b). Accordingly, the Court finds that the regulation allowing one vote per owner, regardless of the number of properties owned, is based on a plausible reading of the governing statute, and the Secretary possessed the authority to promulgate such a regulation. *See id.* This interpretation of the governing statute may not be "the only one [the agency] permissibly could have adopted" and it may not be "the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843, n.11 (citations omitted). But the Court need only conclude that it is a *permissible* construction of the governing statute. *Id.*

In sum, the Court finds that the statute is clear on this issue, and only permits one objection per owner—not per properties owned. Further, even if the statute was silent or ambiguous on that point, Congress provided the Secretary with significant discretion in developing the regulations, and there is nothing in the NHPA limiting the Secretary's authority to allow one vote per property owner, regardless of the number of properties owned. The "regulation is not in conflict with the plain language of the statute" and the Court must therefore "give deference to the agency's interpretation of the statute." *K Mart Corp.*, 486 U.S. at 291–92

(citation omitted). Thus, the Court finds that the agency did not exceed its statutory authority in promulgating 36 C.F.R. § 60.06(g).

### b. Regulation Related to SHPO Review

Plaintiffs next argue that the NPS's regulations cannot be read to shift responsibility to the SHPO to determine whether a majority of owners have objected to the nomination. Plaintiffs spend no more than a half-page on this argument and fail to cite any regulations. The Court believes that Plaintiffs are again referring to 36 C.F.R. § 60.6(g), which provides in part, "Upon receipt of notarized objections respecting a district or single private property with multiple owners, it is the responsibility of the State Historic Preservation Officer to ascertain whether a majority of owners of private property have objected." Plaintiffs argue that this would violate 54 U.S.C. § 302105(c), which provides that "[t]he Secretary shall review the nomination of the property when an objection has been made and shall determine whether or not the property is eligible for inclusion or designation."

In reviewing this argument, the Court first turns to the plain language of the NHPA to ascertain Congress's intent. Section 302105(c) addresses only the Secretary's duty to review the nomination when an objection has been made and determine whether or not the property is eligible for listing. It makes no comment about the duties of the SHPO in preparing the nomination for the Keeper's review or in determining the number of objections. Rather, the NHPA addresses the SHPO's duties in § 302303(b)(2), and provides that the SHPO shall be responsible for, among other things, "identify[ing] and nominat[ing] eligible property to the National Register and otherwise administer[ing] applications for listing historic property on the National Register." Thus, under the plain language of the NHPA, the SHPO is responsible for identifying and nominating eligible property, and the Keeper must then review the nomination

and determine if the property is actually eligible for listing. The Court therefore finds that "Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, including the duties of the SHPO and the Secretary.

Having determined that Congress has spoken on this issue, the Court next considers whether the agency regulations align with Congress's intent. On this point, the Court finds that the regulations do not conflict with Congress's designation of responsibilities in the NHPA. 36 C.F.R. § 60.6(g) does not prohibit or discourage the Secretary from performing his duties under § 302105(c). Rather, it addresses the SHPO's duties in preparing the nomination for the Keeper's review. Then, in 36 C.F.R. § 60.6(s), the regulations acknowledge the Secretary's duty to determine eligibility. That provision states, "If the owner of private property (or the majority of such owners for a district or single property with multiple owners) has objected to the nomination by notarized statement prior to listing, the Keeper shall review the nomination and make a determination of eligibility within 45 days of receipt, unless an appeal is filed." In fact, the SHPO must submit the nomination to the Keeper even if the SHPO determines that a majority of owners object to listing. 36 C.F.R. § 60.6(n).

Further, as Defendants point out, there is a difference between a property's *eligibility* for inclusion on the National Register, and its *listing* on the National Register. A property that is eligible for listing is one that meets the criteria for evaluation, meaning it possesses significance in American history, architecture, archeology, engineering, and culture. *Id.* §§ 60.3(c), 60.4. However, an eligible property may not be listed on the National Register for a variety of reasons—for example, if more than a majority of owners object to the listing. Thus, when 54 U.S.C. § 302105(c) states that "[t]he Secretary shall review the nomination of the property when an objection has been made and shall determine whether or not the property is eligible for

inclusion or designation," it references the Secretary's obligation to determine if the property is *eligible* for listing. Even if the property is eligible for listing, listing may not be appropriate. In those cases, the property can be deemed eligible but not be listed. Thus, the regulations directing the SHPO to determine if a majority of owners object does not in any way abrogate the duties of the Secretary to determine if the property is eligible for listing, nor do they restrict the Secretary's ability to determine if an eligible property should not be listed.

In sum, the Court finds that the regulations at issue are consistent with the governing statutes. The Court will therefore deny Plaintiffs' Motion for Summary Judgment on this issue and will grant Defendants' Motion for Summary Judgment on this issue.

## IV.  CONCLUSION

For the reasons set forth above, the Court will deny Plaintiffs' Motion for Summary Judgment, [R. 47], and grant Defendants' Cross Motion for Summary Judgment, [R. 51].

**IT IS HEREBY ORDERED** as follows:

1.      Plaintiffs' Motion for Summary Judgment, [**R. 47**], is **DENIED**.

2.      Defendants' Cross-Motion for Summary Judgment, [**R. 51**], is **GRANTED**. All claims in this matter are hereby **DISMISSED**.

This the 30th day of September, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY